## DODGE *v.* FORD MOTOR CO.

1. CORPORATIONS—"CAPITAL STOCK"—DEFINITION.

The term "capital stock," in its primary ·sense, means the fund, property, or other means contributed or agreed to be contributed by shareholders as the financial basis for the prosecution of the business of the corporation, and it is always representative of the net assets of the corporation, whatever they may be.

2. SAME — LIMITATION OF CAPITAL STOCK — ASSETS — INTENT — STATUTES.

The limitation of capital stock of corporations under section 2, Act No. 232, Pub. Acts 1903 (section 9018, 2 Comp. Laws 1915), *held*, to apply to the amount of capital which, in the first instance, may be employed in corporate enterprises, and not to be the legislative intent to limit the capital assets of corporations. ·

3. SAME—PROFITS.

Undistributed profits of a corporation belong to it, and, so far as any limitation in the act, may be lawfully employed as capital.

4. SAME—POWERS—ULTRA VIRES.

The smelting of iron ore by a corporation engaged in the manufacture of automobiles, so that its castings might be made direct from the ore rather than from pig iron, is not beyond the power of the corporation.

5. SAME—MONOPOLIES—ANTI-TRUST LAWS—VIOLATION.

Where no monopoly will accrue to a corporation by reinvesting its profits in expanding its plant other than such as accrues to a concern which makes what the public demands, there is no violation of any anti-trust laws in such policy of expansion.

6. SAME—DIVIDENDS—POWERS OF DIRECTORS—DISCRETION—ARBITRARY ACTION OF DIRECTORS—INTERFERENCE BY COURTS.

The directors of a corporation, and they alone, have the power to declare a dividend of the earnings of the corporation, and to determine its amount, and the courts will not interfere unless it is clearly made to appear that they

See notes in L. R. A. 616; L. R. A. 1915D, 1052.

are guilty of fraud or misappropriation of the corporate funds, or refuse to declare a dividend when the corporation has a surplus which it can, without detriment to its business, divide among its stockholders, and when a refusal to do so would amount to such an abuse of discretion as would constitute a fraud or breach of that good faith which they are bound to exercise towards the stockholders.

7. SAME—PURPOSE—RIGHTS OF STOCKHOLDERS.

A business corporation is organized and carried on primarily for the profit of the stockholders, and it is not within the lawful powers of a board of directors to shape and conduct the affairs of a corporation for the merely incidental benefit of shareholders and for the primary purpose of benefiting others.

8. SAME—EXPANSION OF BUSINESS—INTERFERENCE BY COURTS.

On a suit by minority stockholders to enjoin a proposed expansion of the business of an automobile manufacturing corporation by adding a smelter to its equipment, thereby enabling it to add to its output and increase its profits, being part of a general plan formally approved by its board of directors, the court of equity should not interfere with said plan.

9. SAME—SURPLUS—REFUSAL TO DECLARE DIVIDENDS—ARBITRARY ACTION OF BOARD OF DIRECTORS.

Where a corporation would have a surplus of approximately $30,000,000 after paying for approved expansion and improvement of its plant, and could reasonably expect a profit of $60,000,000 a year, refusal by the board of directors to declare extra dividends was arbitrary and the decree of the court below determining that $19,000,000 should be distributed as an extra dividend is affirmed.

10. SAME — MINORITY STOCKHOLDERS — CONSENT TO INCREASE OF CAPITAL STOCK—RIGHT TO DIVIDENDS—ESTOPPEL.

The fact that minority stockholders at one time agreed to a stock dividend increasing the capital stock from $2,000,000 to $100,000,000, which was not done, would not estop them from later demanding proper dividends upon their stock.

Appeal from Wayne; Hosmer, J. Submitted April 9, 1918. (Docket No. 47.) Decided February 7, 1919. Rehearing denied May 1, 1919.

Bill by John F. Dodge and another against the Ford Motor Company and others to compel the declaration of dividends and for an injunction. From the decree rendered, defendants appeal. Affirmed as to dividends and reversed as to the injunction.

*Stevenson, Carpenter, Butzel & Backus* (*Elliott G. Stevenson, William L. Carpenter,* and *Thomas G. Long,* of counsel), for plaintiffs.

*Lucking, Helfman, Lucking & Hanlon* (*Alfred Lucking* and *Alexis C. Angell,* of counsel), for defendants.

The Ford Motor Company is a corporation organized and existing under Act No. 232 of the Public Acts of 1903 (2 Comp. Laws 1915, § 9017 *et seq.*), entitled:

"An act to revise and consolidate the laws providing for the incorporation of manufacturing and mercantile companies or any union of the two, and for the incorporation of companies for carrying on any other lawful business, except such as are precluded from organization under this act by its express provisions, and to prescribe the powers and fix the duties and liabilities of such corporations."

Section 2 of the act relates, in part, to the articles of association, and what shall appear in them, and the fourth subdivision of this section reads:

"Fourth. The amount of the total authorized capital stock which shall not be less that one thousand dollars, and not more than twenty-five million dollars; the amount of capital stock subscribed which shall not be less than fifty per cent. of the authorized capital stock; the articles may provide for common and preferred stock subject to section thirty-five, and in that case shall contain an exact statement of the terms upon which the common and preferred stocks are created, and the amount of each subscribed, and the amount of each paid in."

In 1917, the maximum of capital stock was fixed at fifty million dollars (Act No. 254, Pub. Acts 1917).

The second clause of the ninth subdivision of the same section reads, in part, as follows:

"The amount of the capital stock and number of shares of every corporation organized under this act may be increased or diminished at any annual meeting of the stockholders, or at a special meeting expressly called for that purpose, by a vote of two-thirds of the capital stock of the corporation." * * *

Section 14 reads:

"Every such corporation shall have power to purchase, hold and convey all such real and personal estate as the purposes of the corporation shall require, and all other real and personal estate which shall have been *bona fide* conveyed or mortgaged to said corporation by way of security, or in satisfaction of debts. Any corporation formed under this act may purchase real or personal property necessary for its business, and issue its authorized capital stock to the amount of the value thereof in payment therefor, and the capital stock so issued shall be full paid stock, and not liable to any further call, neither shall the holder thereof be liable to any further payment under any of the provisions of this act, except the liability imposed by section twenty-nine; and in the absence of actual fraud in the transaction, the judgment of the directors as to the value of the property shall be conclusive. And in addition to the powers hereinbefore enumerated, every corporation organized under this act shall possess and exercise all such rights and powers as are necessarily incidental to the exercise of the powers expressly granted herein. It may also purchase and hold any grant of land made by the government to aid in any work of internal improvement."

To this was added by amendment in 1917 (Act No. 254):

"Subject to the limitations of the laws of this State and of the United States with respect to illegal restraints of trade, every such corporation shall have power, in furtherance of the objects of its organization, to hold shares of stock of other corporations organized under the laws of this or any other State

for purposes similar to those for which corporations may be organized under this act: *Provided,* Such other corporations be formed as subsidiary thereto and for the actual carrying on of their immediate lawful business or the natural or legitimate branches or extensions thereof."

The articles of association were executed June 16, 1903, and acknowledged on that day by the parties associating. In the articles the capital stock is fixed at the sum of $150,000, with 1,500 shares of the par value of $100 each. It is recited therein that the amount of capital stock subscribed is $100,000, and that said sum is actually paid in, $49,000 in cash and $51,000 in other property. The other property described is, letters patent, issued and applied for, valued at $40,000, machinery and stock, $10,000, contracts for supplies, $1,000. Article 2 of the articles of association reads:

"The purpose or purposes of this corporation are as follows: To purchase, manufacture and placing on the market for sale of automobiles or the purchase, manufacture and placing on the market for sale of motors and of devices and appliances incident to their construction and operation."

The parties in the first instance associating, who signed the articles, included Henry Ford, whose subscription was for 255 shares, John F. Dodge, Horace E. Dodge, the plaintiffs, Horace H. Rackham and James Couzens, who each subscribed for 50 shares, and several other persons. The company began business in the month of June, 1903. In the year 1908, its articles were amended and the capital stock increased from $150,000 to $2,000,000, the number of shares being increased to 20,000, and in the certificate, made in November, 1908, evidencing the increase of capital stock, it was recited:

"The total amount of stock, including such increase actually paid in, is the sum of two million ($2,000,-

000) dollars, of which one million eight hundred and fifty thousand ($1,850,000) dollars of the increase and fifty thousand ($50,000) dollars of the original capital stock not subscribed, has been paid in by the surrender of all the stockholders to the corporation of their respective claim and right to dividends duly declared by the board of directors of said corporation out of the surplus of said company to the amount of one million nine hundred thousand ($1,900,000) dollars.

"The amount of capital stock subscribed is the sum of two million ($2,000,000) dollars; the amount of said stock actually paid in at the date thereof is the sum of two million ($2,000,000) dollars, of which one hundred thousand ($100,000) dollars represents the capital stock originally subscribed and paid in, and one million nine hundred thousand ($1,900,000) dollars by surrender to the corporation by all stockholders of their claim to dividends duly declared by the board of directors payable out of surplus."

The business of the company continued to expand. The cars it manufactured met a public demand, and were profitably marketed, so that in addition to regular quarterly dividends equal to 5 per cent. monthly on the capital stock of $2,000,000, its board of directors declared and the company paid special dividends: December 13, 1911, $1,000,000; May 15, 1912, $2,000,000; July 11, 1912, $2,000,000; June 16, 1913, $10,000,000; May 14, 1914, $2,000,000; June 12, 1914, $2,000,000; July 6, 1914, $2,000,000; July 23, 1914, $2,000,000; August 23, 1914, $3,000,000; May 28, 1915, $10,000,000; October 13, 1915, $5,000,000, a total of $41,000,000 in special dividends. Sales and profits for several years were:

| Year ending | | | | |
|---|---|---|---|---|
| Sept. 30, | 1910 | 18,664 | cars, | $4,521,509.51 |
| " " | 1911 | 34,466 | " | 6,275,031.07 |
| " " | 1912 | 68,544 | " | 13,057,312.24 |
| " " | 1913 | 168,304 | " | 25,046,767.43 |
| " " | 1914 | 248,307 | " | 30,338,454.63 |
| July 31, | 1915 (10 mos.) | 264,351 | " | 24,641,423.17 |
| " " | 1916 | 472,350 | " | 59,994,918.01 |

The surplus above capital stock was, September 30, 1912, $14,745,095.67, and was increased year by year to $28,124,173.68, $48,827,032.07, $59,135,770.66. July 31, 1916, it was $111,960,907.53. Originally, the car made by the Ford Motor Company sold for more than $900. From time to time, the selling price was lowered and the car itself improved until in the year ending July 31, 1916, it sold for $440. Up to July 31, 1916, it had sold 1,272,986 cars at a profit of $173,-895,416.06. As the cars in use multiplied, sales of parts and of repairs increased so that, in the year ending July 31, 1916, the gross profits from repairs and parts was $3,915,778.94, sales being more than $600,000 for each of the months of May, June and July. For the year beginning August 1, 1916, the price of the car was reduced $80 to $360.

The following is admitted to be a substantially correct statement of the financial affairs of the company on July 31, 1916:

*"Assets.*

Working—

| | |
|---|---|
| Cash on hand and in bank............... | $52,550,771.92 |
| Michigan municipal bonds............... | 1,259,029.01 |
| Accounts receivable ..................... | 8,292,778.41 |
| Merchandise and supplies................ | 31,895,434.69 |
| Investments — outside .................. | 9,200.00 |
| Expense inventories ..................... | 434,055.19 |

Plant—

| | |
|---|---|
| Land ..................................... | 5,232,156.10 |
| Buildings and fixtures................... | 17,293,293.40 |
| Machinery and power plant.............. | 8,896,342.31 |
| Factory equipment ..................... | 3,868,261.02 |
| Tools ................................... | 1,690,688.54 |
| Patterns ................................ | 170,619.77 |
| Patents ................................. | 64,339.85 |
| Office equipment ....................... | 431,249.37 |

| | |
|---|---|
| Total assets ....................... | $132,088,219.58 |

204—Mich.—30.

*Liabilities.*

Working—

Accounts payable ...................... $7,680,866.17
Contract deposits ...................... 1,519,296.40
Accrued pay rolls ...................... 847,953.68
Accrued salaries ...................... 338,268.86
Accrued expenses ...................... 1,175,070.72
Contract rebates ...................... 2,199,988.00
Buyers' P. S. rebate.................... 48,099.00

Reserves—

For fire insurance...................... 57,493.89
For depreciation of plant................ 4,260,275.33

Total liabilities ..................... $18,127,312.05
Surplus .............................. 111,960,907.53
Capital stock ........................ 2,000,000.00

Total ............................. $132,088,219.58

The following statement gives details of the business of the Ford Motor Company for the fiscal year July 31, 1915, to July 31, 1916:

Number of cars made in year............ 508,000
Total business done.....................$206,867,347.46
Profit for the year..................... $59,994,118.01
Cash in hand and in banks.............. $52,550,771.92
Materials on hand...................... $31,895,434.69
Cars in transit and at branch assembling
   plants (about 2½ weeks' output).... 35,650
Cars sold during year.................. 472,350
Employed at home plant................. 34,489
Employed at home offices............... 1,028
Total employees in Detroit plant getting
   $5 a day or more.................... 27,002
Employed at 84 branch plants........... 14,355
Total employees (all plants)........... 49,872
Total employees getting $5 a day or more 36,626"

From a mere assembling plant, the plant of the Ford Motor Company came to be a manufacturing plant, in which it made many of the parts of the car which in the beginning it had purchased from others. At no time has it been able to meet the demand for its cars or in a large way to enter upon the manufacture of motor trucks.

No special dividend having been paid after October, 1915 (a special dividend of $2,000,000 was declared in November, 1916, before the filing of the answers), the plaintiffs, who together own 2,000 shares, or one-tenth of the entire capital stock of the Ford Motor Company, on the 2d of November, 1916, filed in the circuit court for the county of Wayne, in chancery, their bill of complaint, which bill was later, upon leave granted, on April 26, 1917, amended, in which bill they charge that since 1914 they have not been represented on the board of directors of the Ford Motor Company, and that since that time the policy of the board of directors has been dominated and controlled absolutely by Henry Ford, the president of the company, who owns and for several years has owned 58 per cent. of the entire capital stock of the company; that the directors of the company are Henry Ford, David H. Gray, Horace H. Rackham, F. L. Klingensmith, and James Couzens, and the executive officers Henry Ford, president, F. L. Klingensmith, treasurer, and Edsel B. Ford, son of Henry Ford, secretary; that after the filing of the original, and before the filing of the amended, bill, at the annual meeting of the stockholders, David H. Gray retired from the board of directors and Edsel B. Ford was elected and is acting as a director. Setting up that on the 31st of July, 1916, the end of its last fiscal year, the said Henry Ford gave out for publication a statement of the financial condition of the company (the same as hereinabove set out), that for a number of years a regular dividend, payable quarterly, equal to 5 per cent. monthly upon the authorized capital stock, and the special dividends hereinbefore referred to, had been paid, it is charged that notwithstanding the earnings for the fiscal year ending July 31, 1916, the Ford Motor Company has not since that date declared any special dividends,—

"and the said Henry Ford, president of the company, has declared it to be the settled policy of the company not to pay in the future any special dividends, but to put back into the business for the future all of the earnings of the company, other than the regular dividend of five per cent. (5%) monthly upon the authorized capital stock of the company—two million dollars ($2,000,000)."

This declaration of the future policy, it is charged in the bill, was published in the public press in the ci̱.y of Detroit and throughout the United States in substantially the following language:

" 'My ambition,' declared Mr. Ford, 'is to employ still more men; to spread the benefits of this industrial system to the greatest possible number, to help them build up their lives and their homes. To do this, we are putting the greatest share of our profits back into the business.' "

It is charged further that the said Henry Ford stated to plaintiffs personally, in substance, that as all the stockholders had received back in dividends more than they had invested they were not entitled to receive anything additional to the regular dividend of 5 per cent. a month, and that it was not his policy to have larger dividends declared in the future, and that the profits and earnings of the company would be put back into the business for the purpose of extending its operations and increasing the number of its employees, and that inasmuch as the profits were to be represented by investment in. plants and capital investment the stockholders would have no right to complain. It is charged (paragraph 16) that the said Henry Ford,—

"dominating and controlling the policy of said company, has declared it to be his purpose—and he has actually engaged in negotiations looking to carrying such purposes into effect—to invest millions of dollars of the company's money in the purchase of iron ore

mines in the Northern Peninsula of Michigan or State of Minnesota; to acquire by purchase or have built ships for the purpose of transporting such ore to smelters to be erected on the River Rouge adjacent to Detroit in the county of Wayne and State of Michigan; and to construct and install steel manufacturing plants to produce steel products to be used in the manufacture of cars at the factory of said company; and by this means to deprive the stockholders of the company of the fair and reasonable returns upon their investment by way of dividends to be declared upon their stockholding interest in said company."

Setting up that the present invested assets of the company, exclusive of cash on hand, as of July 31, 1916, represented more than thirty times the present authorized capital of the company, and two and one-half times the maximum limit ($25,000,000) fixed by the laws of the State of Michigan for capitalization of such companies (now $50,000,000), it is charged that the present investment in capital and assets constitute an unlawful investment of the earnings and that the continued investment of earnings would be a continuation of such unlawful policy. Setting up unsuccessful efforts to secure a conference with Mr. Ford for the purpose of discussing the question and asking that there be a distribution of a part of the accumulations, it is charged that on September 28, 1916, plaintiffs addressed to him, and had delivered to him by registered letter, the following communication:

"We have for some time, as you know, been endeavoring to make an appointment to see you, for the purpose—as you assumed and informed one of your associates—of discussing the affairs of the Ford Motor Company from the standpoint of our interest as stockholders and with a view to securing action by the board of directors looking to a very substantial distribution from its cash surplus as dividends.

"Not having been able to make an appointment to discuss the matter with you personally, as we very

much desired to do, we write you this letter upon the subject.

"The conditions shown by your recent financial statement—showing approximately $60,000,000 of net profits for the past year and cash surplus in bank exceeding $50,000,000—it seems to us would suggest, without the action being requested, the propriety of the board taking prompt action to distribute a large part of the accumulated cash surplus as dividends to the stockholders to whom it belongs.

"While we would be sorry to have any controversy over the matter, we feel that your attitude toward the stockholders of the company is entirely unwarranted.

"The statements that you have made — that the stockholders are and have been receiving as dividends all they are entitled to—shows a most extraordinary state of mind if it represents your real feelings.

"While a dividend of five per cent. per month, sixty per cent. per annum, on the capital stock of the company, $2,000,000, on its face would seem to be a large dividend—the fact is, however, that the assets of the company representing its surplus is as much the property of the stockholders as the assets representing the capital stock and the stockholders are as much entitled to a dividend that will give them returns on their surplus investment as their capital stock.

"Looking at the situation in this way, the dividend being paid the stockholders is only a little above one per cent. on their capital employed in the business, and entirely out of proportion to what the stockholders are entitled to.

"In view of the existing circumstances, we ask that you promptly call a meeting of the board of directors to consider the situation and lay before them our views as stockholders as outlined in this letter, and we desire to say in this connection that we conceive it to be the duty of the board of directors to distribute as a minimum a special dividend of not less than fifty per cent. of the accumulated cash surplus of the company.

"Another matter that we desire brought to the attention of the board is our contention as stockholders —that the company has no right to use the company's earnings in the continued extension of the plants and property of the company—indeed, from our point of

view, they have already exceeded their authority in this direction.

"We would be pleased to have your acknowledgment of the receipt of this letter and advice that you have called a meeting of the board of directors for the purpose of considering and acting upon the matters referred to in it,"

—and that they sent on the same day copies to each of the members of the board of directors of the Ford Motor Company, and one to Edsel B. Ford, secretary; that although the said Henry Ford and each of the directors were in the city of Detroit at the time of the receipt of such communication, no attention was paid to it and no acknowledgment made by said Henry Ford personally, but in his behalf his son, Edsel, under date October 10, 1916, replied:—

"I beg to acknowledge due receipt of your letter of September 23, 1916, and to say that it would have been answered before this but for my absence from town for a considerable length of time and pressure of other matters.

"It seems to me, in view of all the conditions of business and our extensions, which have been determined upon for so long a time past and to which we have been working, that it would not be wise to increase the dividends at the present time—but, nevertheless, I will lay your letter before the board of directors and we will give your views regarding the increase of dividends and extensions full consideration at our next meeting."

Plaintiffs addressed another letter to Mr. Ford, dated October 11th, acknowledging the receipt of the communication of October 10th, and containing, among other things, the following:

"Rumors are current to the effect that the company has very ambitious plans for the expansion of the operations of the company under consideration and negotiations looking to carrying them into effect that would involve the disbursement of a large part of the cash assets of the company.

"We would thank you very much to advise us by early mail as to whether there is any foundation for the rumors referred to and that plans for the extension or expansion of the operations of business of the company that would absorb any considerable part of the company's present resources, are under consideration and the status of any negotiations relating thereto. In short, as stockholders, we would ask to be advised promptly as to what plans for the enlargement of the plants, property or operations are under way or under consideration.

"Of course, it would be idle to have the board of directors consider the question of disbursing the cash assets of the company in dividends, if, before the board has considered our request, the same have been appropriated in the directions referred to.

"We would respectfully urge that we be given a prompt and full reply to this letter."

And it is charged that up to the date of filing the bill no reply had been received or acknowledgment of said communication.

Paragraphs 25, 26, 27 and 28 of the bill read:

"(25) That during the year ending July 31, 1916, the output of the said Ford company's product amounted to approximately five hundred thousand (500,000) automobiles—yielding to the company, as stated, a net profit of sixty million dollars ($60,000,000). That although there was no reason to conclude that said company could not repeat its production of 500,000 cars during the succeeding year and sell the same readily at the price at which they had been sold in the previous year and although labor and material costs were increasing, the said Henry Ford forced upon the board of directors his policy of reducing the price of such cars by eighty dollars ($80) per car, making a difference in the net sales price of the product of said company for the year ending July 31, 1917, of forty million dollars ($40,000,000). That such policy was adopted only for the purpose of enabling him to continue to carry out the policy he had decided upon to extend the operations and increase the said company's output of manufactured automobiles and a production

schedule for the year July 31, 1916, to July 31, 1917, for eight hundred thousand (800,000) cars was adopted. That in order to prepare for such increased production the company is now, in carrying out such policy of said Henry Ford, engaged in practically duplicating the enormous plant of the company at Highland Park in the county of Wayne and State of Michigan, and in making other large expenditures and preparing to make other expenditures involving millions of dollars in carrying out such plan of the expansion of the business plants and property of the company.

"(26) That unless restrained by the injunction of this honorable court, the said Henry Ford will cause the cash assets that would otherwise be available for dividends, to be disbursed and invested in fixed capital assets.

"(27) In the face of the increased labor and material cost and the uncertain conditions that will prevail in the business world at the termination of the present world war, the policy of said Henry Ford, in continuing the expansion of the business of said corporation, is reckless in the extreme and seriously jeopardizes the interest of your orators as stockholders of said corporation.

"(28) That there are many other corporations engaged in the business of manufacturing cars in competition with the only car manufactured by the Ford Motor Company, to-wit, the class recognized in the trade as 'low priced cars'; that the annual production of such other companies of such class of cars runs into the hundreds of thousands of cars per annum. That if the said Henry Ford is permitted to continue the policy that he has inaugurated and announced he is determined to carry out, of increasing production, reducing the price of cars, and increasing the capital investments in the conduct of such business by withholding the dividends from stockholders to which they are entitled, the necessary result will be the destruction of competition on the sale of the class of cars manufactured by such corporation and the creation of a complete monopoly in the manufacture and sale of such cars in violation of the State, Federal and common law."

Paragraphs 30 and 31 read:

"(30) That by reason of the declared policy of said Henry Ford not to pay dividends and to continue the expansion of the business of said company, including the risks involved in various enterprises proposed to be carried on by said company, your orators' interest in said Ford Motor Company, which is worth not less than $50,000,000 is practically limited to a valuation fixed by the dividends so regularly to be declared, which, as stated, amount to little more than one per cent. upon the actual capital investment of the stockholders of the company in the business of said corporation and renders the disposition of your orators' stockholding interest in said corporation, except at a sacrifice, impossible.

"(31) That the operations of said corporation should by the injunction of this honorable court, be limited at least to the conduct of the company's business within the limits of its present capital investment, not including its cash accumulations, and your orators' interests as such stockholders should not be put in jeopardy by the reckless ventures proposed to be entered upon in connection with the carrying out of the policy of expansion of the said Henry Ford as above herein outlined."

Plaintiffs ask for an injunction to restrain the carrying out of the alleged declared policy of Mr. Ford and the company, for a decree requiring the distribution to stockholders of at least 75 per cent. of the accumulated cash surplus, and for the future that they be required to distribute all of the earnings of the company except such as may be reasonably required for emergency purposes in the conduct of the business.

The answer of the Ford Motor Company, which was filed November 28, 1916, admits most of the allegations in the plaintiffs' bill of complaint, denying, upon information and belief, those in paragraph 16 of the bill, and declining to answer those charges personal to Mr. Henry Ford. It sets out meetings of the board of directors of the 31st of October, 2d of November,

and 8th of November, 1916.   It denies that Henry
Ford forced upon the board of directors his policy of
reducing the price of cars by $80, and says that the
action of the board in that behalf was unanimous and
made after careful consideration.   It admits that it
has decided to increase the output of the company and
is engaged in practically duplicating its plant at High-
land Park; that plans therefor have been under con-
sideration and practically agreed upon for a year and
the lands necessary for the expansion acquired a year
before this suit was begun and their acquisition laid
before the board on the 28th of January, 1916, and
ratified; that these plans were made public as early
as December, 1915, and, upon information and belief,
it is alleged that the plaintiffs knew all about it and
never made any complaint until they filed their bill
in this cause, unless the letter set forth in the bill of
complaint can be called a complaint; that it has been
the policy of the company and its practice for eight
or ten years to cut the price of cars and increase the
output, a plan which has been productive of great
prosperity, and that what was done the first of Au-
gust, 1916, was strictly in accordance with this policy;
that it was not carried out by cutting the price of
cars August 1, 1915, because after full discussion it
was determined that the proposed expansions of busi-
ness were necessary to secure the continued success of
the company and that a considerable additional sum
ought to be accumulated for the purpose of extensions
and making the improvements complained of; that this
policy for the year ending July 31, 1916, was under-
stood by all the directors and the management and, it
is believed, by all the stockholders, including the plain-
tiffs; that the expansion is well under way, building
operations are being carried on; that there is a great
demand for Ford trucks which could not be supplied
without such expansion; that only such extensions and

expansions are contemplated as are shown in the estimates found in the minutes of the directors' meeting. It is denied that the proposed expansions jeopardize the interests of the plaintiffs and asserted that they are in accordance with the best interests of the company and in pursuance of their past policy. It is denied that the policy continued would destroy competition, and any idea of creating a monopoly is denied. The allegations in regard to mining, shipping and transporting iron ore are denied, or that anything is being done or contemplated which will result in disaster. Any plan or purpose or thought to injure or impair the value of plaintiffs' capital stock is denied, while it is asserted that their interests will be improved. The minutes attached to this answer showing action of the board of directors at meetings held in October and November, 1916, are voluminous. They show, among other things, approval of a purchase of property in the city of New York costing $560,052.40; they show discussion of plans regarding a building to be erected on such property, and deferred action. They show that various purchases of property made during the year 1916, from May to August, in Chicago, Detroit, Kansas City, New Jersey, Cleveland, Ohio, Iowa, costing upwards of $900,000, were ratified, and an assembly plant ordered to be constructed at Des Moines, Iowa, at approximately the cost of $420,000. The minutes of the meeting of the board of directors, held November 2, 1916, after providing for the purchase of certain lands adjacent to the plant of the defendant company, contain the following:

"Whereas, the officers have proceeded with the preparations for the increase of the plant and have started the erection of some of the buildings to that end, and having incurred expenditures in connection therewith, the details of which have been laid before the board and duly considered, together with approximate esti-

mates of the total cost of such extensions with expla-
nation by the officers and engineeers of this company,
and which approximate estimates so submitted by the
officers and engineers are as follows:

| | |
|---|---:|
| Manufacturing building, 4-story, 800x600.. | $3,000,000.00 |
| Manufacturing building equipment (jigs and fixtures) | 3,000,000.00 |
| Building 'A' extension | 300,000.00 |
| Building 'A' tools and fixtures | 700,000.00 |
| Power plant extension and equipment | 1,000,000.00 |
| Addition to office building | 220,000.00 |
| Body plant building | 800,000.00 |
| Dry kilns, etc. | 125,000.00 |
| Body plant equipment | 500,000.00 |
| Oakland avenue viaduct (300,000) F. M. Co.'s share | 150,000.00 |
| John R street viaduct (200,000) F. M. Co.'s share | 100,000.00 |
| Total | $9,895,000.00 |

"Now, therefore, resolved that the proceedings and
action heretofore taken and the expenditures made in
the works aforesaid be hereby ratified and confirmed;
and further resolved, that the officers are authorized
to proceed with such plans for building extensions,
purchase of equipment, tools and fixtures as in their
judgment most advantageous and economical for this
company, as follows, viz.:

| | |
|---|---:|
| Equipment, jigs and fixtures | $3,000,000.00 |
| Completion of building 'A' extension | 300,000.00 |
| Building 'A' tools and fixtures | 700,000.00 |
| Power plant extension and equipment | 1,000,000.00 |
| And the officers are empowered to co-operate in the construction of the Oakland avenue viaduct on the most advantageous terms practicable for this company — estimated | 150,000.00 |

"With respect to the manufacturing building, 4-
story, 800x600, the body plant building, dry kilns,
body plant equipment, the addition to office building
and the John R street viaduct, resolved that consid-
eration thereof be deferred until a later date."

And, with respect to certain new operations, contain the following:

"The adoption of the following resolution was moved by Mr. Couzens and supported by Mr. Rackham:

"Whereas this company has for some time past been making preparations looking to the manufacture of its own iron and the erection of a manufacturing plant on lands to be acquired from Mr. Henry Ford at the River Rouge, Wayne county, Michigan, for that purpose, and whereas approximate estimates have been submitted by the company's engineers for such work as follows:

| | |
|---|---|
| Two (2) 500-ton blast furnaces, stoves, blowing engines, ore and stock bins and ore handling equipment.......... | $4,500,000.00 |
| Ore dock and river dock front............ | 1,000,000.00 |
| Turning basin, canal dredging, etc........ | 250,000.00 |
| 1,000-ton by-product coke oven plant, with necessary benzol plant ............... | 2,000,000.00 |
| Power plant ........................... | 1,500,000.00 |
| Foundry buildings ....................... | 550,000.00 |
| Foundry equipment ...................... | 250,000.00 |
| Malleable foundry ...................... | 500,000.00 |
| Malleable foundry equipment............. | 150,000.00 |
| Office building .......................... | 150,000.00 |
| Office building equipment................. | 25,000.00 |
| Track and transportation equipment...... | 250,000.00 |
| Miscellaneous buildings .................. | 200,000.00 |
| Total ..........................| $11,325,000.00 |

"And whereas, certain steps have been taken by the management preliminary to such work, including the hiring of an engineer, preparation of plans, etc.

"Now, therefore, resolved that the undertaking aforesaid be proceeded with, that the action heretofore taken in that behalf be ratified and confirmed and the officers and management are authorized to go forward with said works as in their judgment may be most advantageous and economical to this company and they are authorized to execute and carry out necessary contracts in connection with such work and make all payments required in the course thereof.

"And resolved, that this company purchase of Henry Ford for the purposes aforesaid the following described lands, viz.:   Lands in Springwells township, Wayne country, Michigan, described as follows: bounded on the north by the Michigan Central R. R., bounded on the east by the Pere Marquette R. R., on the south by Dix avenue and River Rouge, and on the west by a line approximately fifty feet west of the east line of P. C. 29 extended to the River Rouge—at the cost thereof to Mr. Ford with interest at the rate of 6 per cent. per annum, approximately $700,000 and the officers are instructed to accept conveyances from Mr. Ford and to pay the price stated upon transfer being completed, and

"Resolved further, that the expense of turning basin and dredging of the canal, as shown upon the plans of the engineers, half of such canal being upon the lands of Mr. Ford and half upon the lands of this company, be borne equally by this company and by Mr. Ford, and that the management be authorized to proceed with such work and make the necessary arrangements to divide the expense.

"Carried unanimously."

A further resolution was offered to build a building on property owned by the company in New York City for offices and salesroom and to lease the balance of the building for hotel purposes, the building to cost approximately $740,000.   At the directors' meeting held November 8, 1916, a dividend of 100 per cent. on the capital stock was ordered paid, and the resolution with respect to the hotel building in New York City carried.   At a meeting of directors held November 13, 1916, the following resolution was unanimously adopted:

"It was moved, supported and unanimously carried that in view of written reports of Engineers Mayo and Kennedy (hereto attached) and the oral report of the president of the company, that all things considered, it seems more desirable to locate the proposed blast furnaces, steel plant and other extensions on the location on River Rouge, rather than on the Detroit

river, and that the officers of the company are authorized and are hereby authorized to proceed with the preparations for such extensions and acquiring of the land as originally passed at the directors' meeting of November 2, 1916, but that no new contracts be entered into until the injunction against the directors has been disposed of."

The answer of Henry Ford is a repetition in many respects of the matter contained in the answer of the Ford Motor Company. He denies that he has declared it to be the settled policy of the company not to pay any special dividends but to put back into the business for the future all the earnings of the company other than the regular dividends of 5 per cent. monthly. He denies that he made a declaration as to his future policy as controlling stockholder in fixing the policy for the management of the corporation. He admits that he used the language substantially set out in the 13th paragraph of the bill, hereinbefore set out, and he does not deny, but admits, that his ambition is as therein stated, but that his action as a director will be controlled by future conditions and with due respect to the interests of all concerned. He declares that he has been and always is open to argument and conviction as to what is best and what is right in the conduct of the affairs of the Ford Motor Company. He denies that he stated personally to plaintiffs in substance that as all of the stockholders had received back in dividends more than they had invested they were not entitled to receive anything additional to the regular dividend of 5 per cent. per month, and that it was not his policy to have larger dividends declared in the future, and that the proceeds and earnings of the company would be put back into the business, etc. He denies the allegations of the 16th subdivision of the bill, and specifically:

"Defendant denies that he has declared it to be his purpose to invest millions of dollars of the company's

money in the purchase of iron ore mines anywhere or to acquire by purchase or have built ships for the purpose of transporting ore. He admits that he caused an investigation to be made relative to obtaining the necessary ore for the proposed blast furnaces hereinafter referred to, but upon having such investigation made several months ago he found that there was abundant competition in the iron ore market and that it was wholly unnecessary and undesirable to acquire ore in any other way than by purchase, and therefore all thought in that direction was abandoned. The same is true with respect to the acquisition of ships for the transportation of ore. This defendant says that the Ford Motor Company has for more than a year past been laying plans publicly and openly for the building of blast furnaces, stoves, blowing engines, coke ovens, foundry buildings and equipment, malleable foundries and equipment and the necessary accompaniments, therefor, for the purpose of producing the iron used in the construction of the cars of the Ford Motor Company. That some contracts have been entered into by the company to that end and some substantial amounts paid out upon the preliminary work. He shows that such blast furnaces and the works above described will be for the great benefit and advantage of the company, not only in the direct saving of cost of iron parts but in the improvement of the quality thereof. He further shows that the present plans do not contemplate the manufacture of steel but that in the future it is hoped to be able to produce at comparatively small increase expense the steel required by the Ford Motor Company in the manufacture of its cars. This defendant denies absolutely the allegation of the sixteenth subdivision that by the means stated in said subdivision sixteen or in any other way, that this defendant proposed to deprive the stockholders of the company of the fair and reasonable return upon their investments."

He answers the charges in the bill respecting attempts on the part of plaintiffs to have an interview with him, explaining why a desired interview did not take place, says he supposed that the proposed inter-

view related to a desire on the part of plaintiffs to sell their stock in the Ford Motor Company to him as they had previously attempted to do. He admits the receipt of letters referred to in the bill of complaint. He admits that the letter of October 11, written by the plaintiffs, was not answered until on or about November 3, but he denies that in the meantime he continued to carry out plans to disburse the cash of the company so that there would not be funds available for declaring dividends.

The 25th paragraph of the answer is as follows:

"25. This defendant denies that he forced upon the board of directors his policy of reducing the price of such cars by eighty dollars per car and says that the action of the board was unanimous thereon after careful consideration. This defendant admits that it was decided to increase the output of the company and admits that the company is engaged in practically duplicating the plant at Highland Park. He shows that the plans therefor have been under discussion and have been adopted for practically a year past and that the entire organization has been working to that end. He shows that most of the lands necessary for such expansion for the Highland Park plant were acquired nearly a year ago. That the plans had been made public as early as last December and upon information and belief he shows that the plaintiffs knew all about it and that they never made any complaint with respect to it until the time of filing the bill herein, unless the letters referred to in the bill, written by the plaintiff, could be said to be such complaint. This defendant shows that it has been the practice of the Ford Motor Company for the past eight or ten years to cut the price of the car annually and to increase the output. That such policy has been productive of great prosperity to the company and to its stockholders. That what was done in that regard on the first of August, 1916, was strictly in pursuance of the regular policy of the company. That this policy of cutting the price was not carried out on the first of August, 1915, because in the counsels of the company, among

its active managers it was, after full discussion, decided that the proposed expansion and buildings were necessary to the continued success of the company and that it would be wiser and better not to cut the price during the fiscal year ending July 31, 1916, in order that a considerable additional fund might be accumulated for the very purpose of building the extensions and making the improvements that are now being complained of by the plaintiffs. This policy so adopted for the fiscal year ending July 31, 1916, was thoroughly understood by all the directors and active members of the management and as this defendant is informed and believes by all of the stockholders, including the plaintiffs. Original price of the touring car which is now sold at three hundred and sixty dollars was upwards of nine hundred dollars, being substantially the same car although it has been greatly improved in many respects since the time when it was sold at nine hundred dollars and upwards. The cuts in the price have been made substantially every year except for the fiscal year ending July 31, 1916. This defendant has every reason to believe that the action of the board of directors in reducing the price for the current year was very wise and this defendant denies that it was adopted for any reason except the permanent good of the company. This defendant admits that construction is now under way and has been for months past in increasing and practically duplicating the size of the plant at Highland Park. Much of the machinery for such expansion has heretofore been ordered, the exact particulars of which will be furnished to the court. This defendant was not present at the meeting of the board of November second. He is informed that the reason why the appropriation for the large building referred to in the estimate was not passed was that construction could not commence until the opening of spring. Building A extension is now approaching completion. The Ford Motor Company is now far behind its orders. The expansion is absolutely essential for the continued prosperity and success of the corporation. There is a great demand for Ford trucks but the manufacturing department of the company has been unable to supply the demand and is now utterly unable to meet the demand. It is esti-

mated by the manufacturing department that it cannot turn out to exceed ten thousand trucks this year whereas it is the estimate of the sales department that one hundred thousand could be sold if they could be turned out."

Paragraph 27 of the answer reads:

"27. This defendant denies that proposed expansion is reckless or that it threatens to jeopardize the interest of the plaintiff but shows that the same is strictly in accordance with the best interests of the company and its stockholders and strictly in pursuance of the past policy of the company. That the proposed expansion and extension are practical, feasible and have only been decided upon after the most careful investigation and advice of experts of the highest obtainable capacity."

Paragraph 36 reads:

"36. Further answering this defendant shows that personally he has always been in favor of maintaining very large cash balances; that he has always been opposed to borrowing money and that he has urged the policy of paying cash for extensions and expansions and other expenses; that he has often in the past yielded his better judgment in the extent of dividends to be paid after discussion with other members of the board; that some of the large dividends paid have been against this defendant's better judgment, but after discussing it he has yielded his judgment to the other members of the board who at the present time are practically the same as during all the past successful years of the corporation, although Mr. John F. Dodge, who was a member for a number of years, retired on or about the 18th day of August, 1913. This defendant shows that he has no fixed and unalterable views on the subject of dividends but is always ready and willing to discuss with other members of the board what seems to be right under the circumstances. Inasmuch as the company was contemplating the entering upon large enterprises of expansion involving large amounts of cash, this defendant has insisted upon great caution in the matter of dividends, particularly in view of the conditions of business through-

out the world. This defendant shows that the expenditures of the Ford Motor Company from day to day are very great and its requirements of cash are enormous. He shows that if, by any chance, there should be a sudden falling off of business or collapse of business that it would require great sums of money to carry on the business of the company, and his idea is to be well fortified against emergencies. This defendant is opposed to any policy which would necessitate the discharge of large numbers of employees in case there should be a sudden depression of business if there be any way to avoid it, and this defendant believes that the latter methods and policies ultimately redound to the best financial interests of the company and its stockholders. This defendant is not in favor of paying out in dividends the surplus of the company to the danger point or any point where it could be regarded as risky in the least degree. This defendant further shows that he is not in favor of keeping up the price of the car to the highest possible point that the public will apparently stand for the time being, but he is in favor of the policy of reducing the price of the car from time to time as the safety and welfare of the company and stockholders will dictate, since he believes such to be a better, permanent policy for the company. Such always has been the policy adopted in the past and he believes that such has been one of the causes of the unexampled success of the company."

Defendants Klingensmith and Rackham also answered the bill, their answers being generally in accord with those of the Ford Motor Company and Mr. Ford.

All of the answers had been filed on November 28th, and were used in a showing in opposition to plaintiffs' application for an injunction, an order to show cause and a restraining order having been made November 2d. The motion for injunction came on to be heard November 29th in the circuit court for the county of Wayne, in chancery, three circuit judges sitting. An opinion upon the application for a temporary injunction was filed December 9, 1916. The conclusions of

two of said judges are expressed in the following excerpt from the opinion:

"We are of the opinion that the expansion of the business, by way of the establishment of a smelting plant, at the River Rouge, should be restrained, pending an early hearing upon the question of whether the diverting of accumulated cash profits to that end is an abuse of discretion on the part of the directors. This involves a mixed question of fact and law, and we feel that the allegations of the bill, and the showing in support thereof, makes this a question to be decided only on a hearing upon the merits, and therefore matters should stand as they are, pending such hearing. "Considering the importance of the questions involved, we feel there should be a hearing on the merits within sixty days. Let an injunction issue restraining defendants from using accumulated cash profits on hand for the establishment of a smelting plant."

The third judge concurred in granting the injunction, but refused to concur in the conclusion that the defendant corporation could lawfully engage in the smelting business. An order having been entered in the circuit court in accordance with the opinion, application was made to the Supreme Court for a writ of mandamus to vacate and set aside said order. Upon that application, it appearing that considerable contracts had been made, that loss would attend an interruption of the carrying out of plans, and that Mr. Ford and others had offered to indemnify the company and plaintiffs, an alternative order was issued, whereupon the order for temporary injunction was modified in such way as to permit the use of the accumulated cash profits of the Ford Motor Company not exceeding $10,000,000 for the establishment of a smelting plant during the pendency of this suit and until the further order of the court, upon condition that a bond in the sum of $10,000,000, conditioned to refund to the Ford Motor Company all money so used, be given, and also conditioned that such obligation

may be enforced against such defendants by the final decree herein or by supplemental proceedings in this cause. Thereupon Messrs. Ford, Rackham, and Klingensmith made their writing obligatory in accordance with said order, and the bond was approved January 6, 1917.

The cause came on for hearing in open court on the 21st of May, 1917. A large volume of testimony was taken, with the result that a decree was entered December 5, 1917, in and by which it is decreed that within thirty days from the entry thereof the directors of the Ford Motor Company declare a dividend upon all of the shares of stock in an amount equivalent to one-half of, and payable out of, the accumulated cash surplus of said Ford Motor Company, on hand at the close of the fiscal year ending July 31, 1916, less the aggregate amount of the special dividends declared and paid after the filing of the bill and during the year ending July 31, 1917, the amount to be declared being $19,275,385.96. It was further decreed:

"*Third.* The owning, holding or operating by the defendant, Ford Motor Company, of, and the using or appropriating or incurring obligations which might require or necessitate the using or appropriating of any funds or other property of said defendant, Ford Motor Company, for a smelting plant or blast furnace or furnaces of the kind or character which the proofs adduced herein show to be contemplated and now in course of construction on or near the River Rouge, and of any lands, buildings, machinery or equipment therefor, and other incident thereof, is without authority of law and is permanently and absolutely restrained and enjoined.

"*Fourth.* The increase of the fixed capital assets of the defendant, Ford Motor Company, beyond those at the date of the entry hereof owned and held by the said corporation is without authority of law and is permanently and absolutely restrained and enjoined. The date of the entry hereof is taken, instead of the date of the objections raised by plaintiffs to any such

increase, at the suggestion of plaintiffs, so that said corporation shall not be in anywise embarrassed through the wrongful acts of the individual defendants. The said fixed capital assets so owned and held at the date of the entry hereof shall be deemed to include such further investment as may be necessary to complete or to complement the same so as to be properly usable in the conduct of the regular business of the said corporation. The said fixed capital assets shall be deemed to be exclusive of those of the kind or character contemplated in the next preceding paragraph hereof.

"The holding of liquid assets (including accumulations of and from the earnings and profits of regular business operations from time to time) by the defendant, Ford Motor Company, in excess of such as may be reasonably required in the proper conduct and carrying on of the business and operations of said corporation in connection with, and by the use of, the fixed capital assets, limited as aforesaid, is likewise without authority of law and is permanently and absolutely restrained and enjoined, and said defendant corporation and its board of directors, the individual defendants herein and their respective successors in office, are directed and commanded to declare and distribute, as dividends to the stockholders, any such excess which may now exist or may accrue from time to time hereafter. The term 'liquid assets' as used herein shall be deemed to include all assets other than fixed capital assets within the meaning generally understood in business of said last mentioned term.

"The intent and purpose of this subdivision 'fourth' of this decree is to fix a maximum limit for the aggregate assets of the defendant, Ford Motor Company, and if it be practicable to increase either class (fixed or liquid) of assets out of the other without affecting the aggregate, such increase shall be proper — the limit in this subdivision stated for each class having been adopted as the most convenient manner of stating the limit of the aggregate."

The defendants Ford, Rackham and Klingensmith are ordered to account for any and all sums used since the filing of the bill in and about the establishment

of a smelting plant, and within thirty days after the accounting is completed to pay to the Ford Motor Company, in pursuance of the obligation of the undertaking executed by them, the amount of such accounting found and determined to have been in fact paid out in and about the work aforesaid, and to discharge all liabilities incurred in that behalf, taking from the Ford Motor Company conveyance and transfer of any and all property purchased and acquired in the establishment of said plant. Dates are fixed for the payment of the special dividend ordered to be made, and plaintiffs are awarded their costs.

It should be stated that as to the defendants James Couzens and David Gray the bill of complaint was taken as confessed.

The limited dividend ordered is fixed with reference to the written demand of plaintiffs for the distribution of 50 per cent. of the cash.

Defendants have appealed, plaintiffs have not appealed, from the decree. In the briefs, appellants state and discuss the following propositions:

"(1) The claim of plaintiffs' counsel that a manufacturing corporation in Michigan may not have more than twenty-five millions (now fifty million) of capital assets, is without merit.
"(2) Monopoly.
"There is nothing in the anti-trust laws which affects this case. Mere bigness of a corporation is not unlawful.
"(3) It is lawful for the Ford Motor Company to build blast furnaces at the Rouge.
"(a) No claim in this regard is made by plaintiffs in the bill of complaint.
"(b) The plaintiffs are estopped by their conduct to raise the question.
"(c) The work is not *ultra vires* the corporation.
"(4) The management of the corporation and its affairs rests in the board of directors and no court will interfere or substitute its judgment so long as the proposed actions are not *ultra vires* or fraudulent.

They may be ill-advised, in the opinion of the court, but this is no ground for exercise of jurisdiction.

"(5) The board has full power over the matter of investing the surplus and as to dividends so long as they act in good faith.

"(6) Such rights of management and control over investments and dividends are not only rules of law, they are rights fixed by the contract between the parties in the formation of the corporation.

"(7) These things are so although the majority of the stock is held by one man.

"It is the right and the duty of the majority to control. This duty must be exercised and the responsibility can not be shifted or evaded.

"(8) Motives of the board members are not material and will not be inquired into by the court so long as the acts are within their lawful powers.

"(9) Motives of a humanitarian character will not invalidate or form the basis of any relief so long as the acts are within the lawful powers of the board, if believed to be for the permanent welfare of the company.

"(10) The court will not entertain a bill to enforce unconscionable demands, no matter what the legal rights of plaintiffs may be."

In the brief for plaintiffs, the grounds for relief are stated as follows:

"(1) The proposed scheme of expansion is not for the financial advantage of the corporation, either mediate or immediate, and is not to be prosecuted with that intent, but for the purpose of increasing the number of employees and of the cars produced, to the end of giving employment and low-priced cars to a greater number of people.

"(These are ends worthy in themselves but not within the scope of an ordinary business corporation —ends which, if prosecuted, should be by individuals associated for such purposes.)

"(2) If the proposed scheme of expansion were for the proper and legitimate uses and needs of the corporation and a cash surplus equivalent to that accumulated and now on hand were necessary for the business of the corporation, nevertheless, a proper divi-

dend ought to be required to be declared and paid out of such accumulated cash surplus because the only reason there would not be ample cash on hand for all purposes, including proper dividends, is that the price of the cars and of the parts therefor, has been arbitrarily fixed at a figure which it is intended shall not produce a net profit sufficient to fulfill all those requirements, including the payment of proper dividends, and the requiring of the payment of dividends will force, and it is the only way by which can be forced the fixing of prices which will produce the requisite amount of net profits.

"(The whole scheme is to bring about such a relation of wages, revenue and cash requirements of the business as to preclude dividends of a reasonable return upon the fair value of the capital stock.)

"(3) The relation, irrespective of any limitation imposed by statute, between the authorized capital stock of the Ford Motor Company, $2,000,000.00, and the accumulated surplus (outside of cash on hand and municipal bonds in which some of the same has been temporarily invested) $58,000,000.00, is such as in and of itself requires the prevention of the further conversion of accumulated cash surplus from current earnings into capital investment against the objection of any stockholder.

"(4) A smelting plant for the manufacture from the ore of iron for use in the manufacture of automobiles is not within the power of a corporation organized under Act No. 232 of the Public Acts of 1903.

"(5) The capital stock of a corporation organized under Act No. 232 of the Public Acts of 1903 is limited to $25,000,000.00, and as defendant corporation has now, as shown by the financial statement, an actual capital investment (outside of cash on hand and municipal bonds in which some of the same has been temporarily invested) of $60,000,000.00, the conversion of the accumulated cash surplus from current earnings into capital investment by the enlargement of the plant and facilities for the manufacture and sale of automobiles is within the inhibition of the statutory limitation."

OSTRANDER, J. (*after stating the facts*). The au-

thorized capital stock of the defendant company is
$2,000,000. Its capital, in July, 1916, invested in
some form of property, including accounts receivable,
was $78,278,418.65, and, less liabilities other than cap-
ital stock, was more than $60,000,000. Besides this,
it had ana was using as capital nearly $54,000,000 in
cash or the equivalent of cash. It is contended by
plaintiffs that because the statute has prescribed that
the total authorized capital stock shall be not less than
$1,000, and not more than $25,000,000 (now $50,000,-
000), the capital of any corporation organized under
the act may not lawfully exceed $25,000,000 (now
$50,000,000). In the argument presented by them the
term capital is used as meaning—

"the aggregate of the sums subscribed and paid in or
secured to be paid in by the shareholders, with the
addition of all gains or profits realized in the use and
investment of those sums; or, if losses have been in-
curred, then it is the residue after deducting such
losses."

Pointing out that the shares of stock are at all times
representative of the capital, whatever it may be, it is
said that the learned trial judge decided that—

"it was the legislative intent to prohibit a corporation
having a capital in excess of the maximum limitation,
whether that excess was acquired by contributions
from stockholders or from profits on those contribu-
tions."

And, in the judgment of counsel for plaintiffs, the
essence of the reasoning employed by the trial judge
may be and is stated by them in this language:

"Looking at the statute, the history of the times
and the constitutional provision respecting corpora-
tions, it appears that the limitation in question was
put in the statute because it was believed that mis-
chief would result unless a restriction was placed upon
corporate capital; that it was the intent of the statute
to prevent this mischief; that to permit corporations

to increase their capital, at pleasure, from undivided profits would frustrate that intent and give to old corporations powers, rights and privileges which were not given to new corporations, and thus make corporations unequal before the law, contrary to the intent of the provision in our Constitution respecting corporations to place them all on a basis of equality."

It was the opinion of the three judges, to whom was presented the application for a temporary restraining order, that the statute, in the language referred to, does not limit the amount of capital—that portion of the assets of a corporation regardless of their source, utilized for the conduct of the corporate business for the purpose of deriving gains and profits —which a corporation organized under the act may lawfully possess.

The term capital stock, in its primary sense, means the fund, property, or other means contributed or agreed to be contributed by shareholders as the financial basis for the prosecution of the business of the corporation, being made directly through stock subscriptions or indirectly through the declaration of stock dividends. The capital stock of a corporation is always representative of the net assets of the corporation, whatever they may be, and so a share of stock may be worth more or less than its par value, because it is representative of an aliquot part of the net assets of the corporation. The section of the statute with which we are dealing relates to the organization of corporations, and, plainly, it is the legislative intent that no more than $50,000,000 of capital shall be, in the first instance, aggregated and embarked in business under this law. It has been the policy of the State, unlike that of most of the States, to limit the aggregate of capital which, in the first instance, may be employed in corporate enterprises; but the history of legislation is not evidence of a continuing State policy which limits the capital assets of corporations.

Act No. 41, Laws 1853, authorized the formation of manufacturing corporations. It contained the provision (section 67):

"The amount of the capital stock in every such corporation shall be fixed and limited by the stockholders in their articles of association, and shall, in no case, be less than ten thousand dollars, nor more than five hundred thousand dollars, and shall be divided into shares of twenty-five dollars each. The capital stock may be increased, and the number of shares, at any meeting of the stockholders called for that purpose: *Provided,* That the amount so increased shall not, with the existing capital, exceed five hundred thousand dollars."

In 1875, Act No. 89, this law was amended. As to corporations engaged in mining or manufacturing iron, steel, silver, lumber or copper, the maximum limit of capital stock was fixed at $2,500,000, as to any other manufacturing corporation the limit was $500,000, and it was expressly subject to these limitations that the capital stock was permitted to be increased. At the same session, Act No. 187 was passed for the incorporation of manufacturing companies. The minimum limit of capital stock was fixed at $10,000, which might be increased by stockholders, the maximum limit being $2,500,000. In 1881, Act No. 257, the maximum was increased to $5,000,000. Act No. 232 of the Public Acts of 1885 was a revision of laws for incorporating manufacturing companies. By its terms the articles of incorporation were required to state the amount of capital stock, not less than $5,000 or more than $5,000,000, except that corporations for manufacturing cheese or other products of milk might have not less than $1,000 capital stock. The express terms are that, subject to these limitations, the capital stock may be increased or diminished, etc., etc. In argument, significance is attached to the language employed in the act of 1853 author-

izing an increase of capital stock, but providing that
the amount of the increase *with the existing capital*
shall not exceed the maximum of $500,000. Signifi-
cance is also attached to the language in the amend-
ing acts which permit an increase of capital stock
subject to the limitations as to minimum and maxi-
mum of capital stock.

Assuming that the legislature in passing the law
of 1853 had in view the distinction between capital
stock and capital, or capital assets, and intended a
maximum limitation of the amount of capital, the as-
sumption must, of course, rest upon the language em-
ployed in the law. When the legislature in the later
act omitted the words upon which the assumption is
based, no reason is apparent for the conclusion that
the limitation of capital was still intended. If the
act of 1853 contains evidence of a policy limiting capi-
tal assets, the act of 1903 contains no such evidence.

There is no apparent reason for entering upon the
task of interpreting or construing language which is
self-interpreting, which has a clear, reasonable mean-
ing. The same general implications are to be drawn
from the phrase "not more than" as from the phrase
"not less than." We are not called upon to find a
reason for the policy of limiting the capital stock or
for the failure to also limit the value of the assets
which may at any time be employed in the corporate
business. We may assume a legislative reason, but
may not assume that, because a possible reason may
be given for a further limitation, such further limita-
tion must be implied.

The reasons given for a different interpretation of
the language, reasons which introduce matter not in
the statute, are inconclusive. If the claimed statute
limitation exists, it is imperative. It is manifestly
impracticable, if not impossible, to limit the use in its
business by a corporation, of any size, of its profits,

to require that, when organized with the maximum amount of capital stock, all profits shall be set aside. It is conceded, in argument, that there must be some variation, some leeway. But, if any, how much? It may be supposed that the legislature looked with disfavor upon an initial aggregation of capital exceeding a certain amount. It cannot be supposed that it looked with disfavor upon a profitable corporate existence.

Subscriptions to capital stock may be paid for in property valued by those associating. It may be that a patent is contributed which, until exploited, has only an estimated potential value—no selling value—but, after exploitation, would sell for more than the maximum limit fixed for capital stock. No one would contend that a $50,000,000 manufacturing corporation could not borrow money for the purposes of its business. Of course, if it borrowed, it would owe for the money and, as matter of bookkeeping, would not by borrowing expand its capital assets. But, in fact, at the expense of a small rate of interest, it might add $50,000,000 to the capital actually employed in business.

Experience would not lead to the belief that any manufacturing corporation, of any size, would continue to embark in the enterprise such profits as competition permitted and stockholders were willing to forego, to the public detriment. It happens that the Ford Motor Company has had an unusual, a phenomenal, experience, but this affords no reason for finding the meaning in the statute which plaintiffs insist shall be given to it. That no limit is in terms placed upon the value of assets—capital—which may be employed is a circumstance supporting the conclusion that none was intended.

Any aggregation of capital, from $1,000 to $50,000,-000, is now permitted—invited—to be embarked in

business under this statute, the corporations formed to compete among themselves and with foreign corporations admitted to do business in this State. The purpose of any organization under the law is earnings—profit. Undistributed profits belong to the corporation, and, so far as any limitation can be found in this act, may be lawfully employed as capital. If the meaning of the law were more doubtful, it would be prudent, if not imperative, that the legislature be left to make plain what is supposed to be obscure.

There is little, if anything, in the bill of complaint which suggests the contention that the smelting of iron ore as a part of the process of manufacturing motors is, or will be, an activity *ultra vires* the defendant corporation. On the contrary, the bill charges that the erection of smelters and such other buildings, machinery and appliances as are intended to go along with the business of smelting ore is part of a general plan of expansion of the business of defendant corporation which is in itself unwise and which is put into operation for the purpose of absorbing profits which ought to be distributed to shareholders. Restraint is asked, not because the smelting business is *ultra vires* the corporation, but because the whole plan of expansion is inimical to shareholders' rights and was formulated and will be carried out in defiance of those rights.

The gray iron parts of a Ford car weigh, in the rough, 268.90 pounds, and when finished 215.71 pounds. This iron, as now made by defendants, costs, per car, at the prices of iron when the cause was tried, $11.184. The malleable iron parts weigh, finished, per car, 69.63 pounds and would cost $6.757. The total cost per car of gray and malleable iron parts is less than $18.

The smelter proposition involves, of course, much more than the initial expenditure for a plant. It in-

204—Mich.—32.

volves the use of a large amount of capital to secure the finished product for the cars. Quantities of iron ore must be purchased and carried in stock, coal for the coke ovens must be purchased, the plant must be maintained. If the plant produces the necessary iron and 800,000 cars are made in a year, something more than 270,000,000 pounds of iron will be produced, and if, as is claimed by Mr. Ford, the cost is reduced to the company by one-half and better iron made, a saving of nine or ten dollars on the cost of each car will be the result. Presumably, this saving will also be reflected in the profits made from sales of parts. Ultimately, the result will be either a considerable additional profit upon each car sold or it will permit a reduction in the selling price of cars and parts. The process proposed to be used has not been used, commercially.

The contention that the project is *ultra vires* the defendant corporation appears to have been made upon the application for a preliminary restraining order, and at the hearing on the merits, as a reason for denying the right to invest instead of distributing the money which the proposed plant will cost, with no claim of surprise upon the part of defendants.

Strictly, upon the pleadings, the question of *ultra vires* is not for decision, and this is not seriously denied. Assuming, however, in view of the course taken at the hearing, it is proper to express an opinion upon the point, it must be said that to make castings from iron ore rather than to make them from pig iron, as defendant is now doing, eliminating one usual process, is not beyond the power of the corporation. In its relation to the finished product, iron ore, an article of commerce, is not very different from lumber. It is admitted that the defendant company may not undertake to smelt ore except for its own uses. Defendant corporation is organized to manufacture

motors and automobiles and their parts. To manufacture implies the use of means of manufacturing as well as the material. No good reason is perceived for saying that as matter of power it may not manufacture all of an automobile. In doing so, it need not rely upon the statute grant of incidental powers. Extreme cases may be put, as, for example, if it may make castings from iron ore, may it invest in mines which produce the ore and in means for transporting the ore from mine to factory? Or, if it may make the rubber tires for cars, may it own and exploit a rubber plantation in Brazil, or elsewhere? No such case is presented, and until presented need not be considered.

As we regard the testimony as failing to prove any violation of anti-trust laws or that the alleged policy of the company, if successfully carried out, will involve a monopoly other than such as accrues to a concern which makes what the public demands and sells it at a price which the public regards as cheap or reasonable, the case for plaintiffs must rest upon the claim, and the proof in support of it, that the proposed expansion of the business of the corporation, involving the further use of profits as capital, ought to be enjoined because inimical to the best interests of the company and its shareholders, and upon the further claim that in any event the withholding of the special dividend asked for by plaintiffs is arbitrary action of the directors requiring judicial interference.

The rule which will govern courts in deciding these questions is not in dispute. It is, of course, differently phrased by judges and by authors, and, as the phrasing in a particular instance may seem to lean for or against the exercise of the right of judicial interference with the actions of corporate directors, the context, or the facts before the court, must be considered. This court, in *Hunter* v. *Roberts, Throp & Co.,*

83 Mich. 63, 71, recognized the rule in the following language:

"It is a well-recognized principle of law that the directors of a corporation, and they alone, have the power to declare a dividend of the earnings of the corporation, and to determine its amount. 5 Am. & Eng. Enc. Law [1st Ed.], p. 725. Courts of equity will not interfere in the management of the directors unless it is clearly made to appear that they are guilty of fraud or misappropriation of the corporate funds, or refuse to declare a dividend when the corporation has a surplus of net profits which it can, without detriment to its business, divide among its stockholders, and when a refusal to do so would amount to such an abuse of discretion as would constitute a fraud, or breach of that good faith which they are bound to exercise towards the stockholders."

In 2 Cook on Corporations (7th Ed.), § 545, it is expressed as follows:

"The board of directors declare the dividends, and it is for the directors, and not the stockholders, to determine whether or not a dividend shall be declared.

"When, therefore, the directors have exercised this discretion and refused to declare a dividend, there will be no interference by the courts with their decision, unless they are guilty of a wilful abuse of their discretionary powers, or of bad faith or of a neglect of duty. It requires a very strong case to induce a court of equity to order the directors to declare a dividend, inasmuch as equity has no jurisdiction, unless fraud or a breach of trust is involved. There have been many attempts to sustain such a suit, yet, although the court do not disclaim jurisdiction, they have quite uniformly refused to interfere. The discretion of the directors will not be interfered with by the courts, unless there has been bad faith, wilful neglect, or abuse of discretion.

"Accordingly, the directors may, in the fair exercise of their discretion, invest profits to extend and develop the business, and a reasonable use of the profits to provide additional facilities for the business cannot be objected to or enjoined by the stockholders."

In 1 Morawetz on Corporations (2d Ed.), § 447, it is stated:

"Profits earned by a corporation may be divided among its shareholders; but it is not a violation of the charter if they are allowed to accumulate and remain invested in the company's business. The managing agents of a corporation are impliedly invested with a discretionary power with regard to the time and manner of distributing its profits. They may apply profits in payment of floating or funded debts, or in development of the company's business; and so long as they do not abuse their discretionary powers, or violate the company's charter, the courts cannot interfere.

"But it is clear that the agents of a corporation, and even the majority, cannot arbitrarily withhold profits earned by the company, or apply them to any use which is not authorized by the company's charter. The nominal capital of a company does not necessarily limit the scope of its operations; a corporation may borrow money for the purpose of enlarging its business, and in many instances it may use profits for the same purpose. But the amount of the capital contributed by the shareholders is an important element in determining the limit beyond which the company's business cannot be extended by the investment of profits. If a corporation is formed with a capital of $100,000 in order to carry on a certain business, no one would hesitate to say that it would be a departure from the intention of the founders to withhold profits, in order to develop the company's business, until the sum of $500,000 had been amassed, unless the company was formed mainly for the purpose of accumulating the profits from year to year. The question in each case depends upon the use to which the capital is put, and the meaning of the company's charter. If a majority of the shareholders or the directors of a corporation wrongfully refuse to declare a dividend and distribute profits earned by the company, any shareholder feeling aggrieved may obtain relief in a court of equity.

"It may often be reasonable to withhold part of the earnings of a corporation in order to increase its sur-

plus fund, when it would not be reasonable to withhold all the earnings for that purpose. The shareholders forming an ordinary business corporation expect to obtain the profits of their investment in the form of regular dividends. To withhold the entire profits merely to enlarge the capacity of the company's business would defeat their just expectations. After the business of a corporation has been brought to a prosperous condition, and necessary provision has been made for future prosperity, a reasonable share of the profits should be applied in the payment of regular dividends, though a part may be reserved to increase the surplus and enlarge the business itself."

One other statement may be given from *Park* v. *Grant Locomotive Works,* 40 N. J. Eq. 114 (3 Atl. 162, 45 N. J. Eq. 244, 19 Atl. 621):

"In cases where the power of the directors of a corporation is without limitation, and free from restraint, they are at liberty to exercise a very liberal discretion as to what disposition shall be made of the gains of the business of the corporation. Their power over them is absolute as long as they act in the exercise of their honest judgment. They may reserve of them whatever their judgment approves as necessary or judicious for repairs or improvements, and to meet contingencies, both present and prospective. And their determination in respect of these matters, if made in good faith and for honest ends, though the result may show that it was injudicious, is final, and not subject to judicial revision."

It is not necessary to multiply statements of the rule.

To develop the points now discussed, and to a considerable extent they may be developed together as a single point, it is necessary to refer with some particularity to the facts.

When plaintiffs made their complaint and demand for further dividends the Ford Motor Company had concluded its most prosperous year of business. The demand for its cars at the price of the preceding year

continued. It could make and could market in the year beginning August 1, 1916, more than 500,000 cars. Sales of parts and repairs would necessarily increase. The cost of materials was likely to advance, and perhaps the price of labor, but it reasonably might have expected a profit for the year of upwards of $60,000,000. It had assets of more than $132,000,000, a surplus of almost $112,000,000, and its cash on hand and municipal bonds were nearly $54,000,000. Its total liabilities, including capital stock, was a little over $20,000,000. It had declared no special dividend during the business year except the October, 1915, dividend. It had been the practice, under similar circumstances, to declare larger dividends. Considering only these facts, a refusal to declare and pay further dividends appears to be not an exercise of discretion on the part of the directors, but an arbitrary refusal to do what the circumstances required to be done. These facts and others call upon the directors to justify their action, or failure or refusal to act. In justification, the defendants have offered testimony tending to prove, and which does prove, the following facts. It had been the policy of the corporation for a considerable time to annually reduce the selling price of cars, while keeping up, or improving, their quality. As early as in June, 1915, a general plan for the expansion of the productive capacity of the concern by a practical duplication of its plant had been talked over by the executive officers and directors and agreed upon, not all of the details having been settled and no formal action of directors having been taken. The erection of a smelter was considered, and engineering and other data in connection therewith secured. In consequence, it was determined not to reduce the selling price of cars for the year beginning August 1, 1915, but to maintain the price and to accumulate a large surplus to pay for the proposed expansion of plant

and equipment, and perhaps to build a plant for smelting ore. It is hoped, by Mr. Ford, that eventually 1,000,000 cars will be annually produced. The contemplated changes will permit the increased output.

The plan, as affecting the profits of the business for the year beginning August 1, 1916, and thereafter, calls for a reduction in the selling price of the cars. It is true that this price might be at any time increased, but the plan called for the reduction in price of $80 a car. The capacity of the plant, without the additions thereto voted to be made (without a part of them at least), would produce more than 600,000 cars annually. This number, and more, could have been sold for $440 instead of $360, a difference in the return for capital, labor and materials employed of at least $48,000,000. In short, the plan does not call for and is not intended to produce immediately a more profitable business but a less profitable one; not only less profitable than formerly but less profitable than it is admitted it might be made. The apparent immediate effect will be to diminish the value of shares and the returns to shareholders.

It is the contention of plaintiffs that the apparent effect of the plan is intended to be the continued and continuing effect of it and that it is deliberately proposed, not of record and not by official corporate declaration, but nevertheless proposed, to continue the corporation henceforth as a semi-eleemosynary institution and not as a business institution. In support of this contention they point to the attitude and to the expressions of Mr. Henry Ford.

Mr. Henry Ford is the dominant force in the business of the Ford Motor Company. No plan of operations could be adopted unless he consented, and no board of directors can be elected whom he does not favor. One of the directors of the company has no stock. One share was assigned to him to qualify him

for the position, but it is not claimed that he owns it. A business, one of the largest in the world, and one of the most profitable, has been built up. It employs many men, at good pay.

"My ambition," said Mr. Ford, "is to employ still more men, to spread the benefits of this industrial system to the greatest possible number, to help them build up their lives and their homes. To do this we are putting the greatest share of our profits back in the business."

"With regard to dividends, the company paid sixty per cent. on its capitalization of two million dollars, or $1,200,000, leaving $58,000,000 to reinvest for the growth of the company. This is Mr. Ford's policy at present, and it is understood that the other stockholders cheerfully accede to this plan."

He had made up his mind in the summer of 1916 that no dividends other than the regular dividends should be paid, "for the present."

"Q. For how long? Had you fixed in your mind any time in the future, when you were going to pay—

"A. No.

"Q. That was indefinite in the future?

"A. That was indefinite, yes, sir."

The record, and especially the testimony of Mr. Ford, convinces that he has to some extent the attitude towards shareholders of one who has dispensed and distributed to them large gains and that they should be content to take what he chooses to give. His testimony creates the impression, also, that he thinks the Ford Motor Company has made too much money, has had too large profits, and that although large profits might be still earned, a sharing of them with the public, by reducing the price of the output of the company, ought to be undertaken. We have no doubt that certain sentiments, philanthropic and altruistic, creditable to Mr. Ford, had large influence in determining the policy to be pursued by the Ford

Motor Company—the policy which has been herein referred to.

It is said by his counsel that—

"Although a manufacturing corporation cannot engage in humanitarian works as its principal business, the fact that it is organized for profit does not prevent the existence of implied powers to carry on with humanitarian motives such charitable works as are incidental to the main business of the corporation."

And again:

"As the expenditures complained of are being made in an expansion of the business which the company is organized to carry on, and for purposes within the powers of the corporation as hereinbefore shown, the question is as to whether such expenditures are rendered illegal because influenced to some extent by humanitarian motives and purposes on the part of the members of the board of directors."

In discussing this proposition, counsel have referred to decisions such as *Hawes* v. *Oakland*, 104 U. S. 450; *Taunton* v. *Royal Ins. Co.*, 2 Hem. & Miller, 135; *Henderson* v. *Bank of Australasia*, L. R. 40 Ch. Div. 170; *Steinway* v. *Steinway & Sons*, 40 N. Y. Supp. 718; *People, ex rel. Metropolitan Life Ins. Co.*, v. *Hotchkiss*, 136 App. Div. 150 (120 N. Y. Supp. 649). These cases, after all, like all others in which the subject is treated, turn finally upon the point, the question, whether it appears that the directors were not acting for the best interests of the corporation. We do not draw in question, nor do counsel for the plaintiffs do so, the validity of the general propositions stated by counsel nor the soundness of the opinions delivered in the cases cited. The case presented here is not like any of them. The difference between an incidental humanitarian expenditure of corporate funds for the benefit of the employees, like the building of a hospital for their use and the employment of

agencies for the betterment of their condition, and a general purpose and plan to benefit mankind at the expense of others, is obvious. There should be no confusion (of which there is evidence) of the duties which Mr. Ford conceives that he and the stockholders owe to the general public and the duties which in law he and his codirectors owe to protesting, minority stockholders. A business corporation is organized and carried on primarily for the profit of the stockholders. The powers of the directors are to be employed for that end. The discretion of directors is to be exercised in the choice of means to attain that end and does not extend to a change in the end itself, to the reduction of profits or to the nondistribution of profits among stockholders in order to devote them to other purposes.

There is committed to the discretion of directors, a discretion to be exercised in good faith, the infinite details of business, including the wages which shall be paid to employees, the number of hours they shall work, the conditions under which labor shall be carried on, and the prices for which products shall be offered to the public. It is said by appellants that the motives of the board members are not material and will not be inquired into by the court so long as their acts are within their lawful powers. As we have pointed out, and the proposition does not require argument to sustain it, it is not within the lawful powers of a board of directors to shape and conduct the affairs of a corporation for the merely incidental benefit of shareholders and for the primary purpose of benefiting others, and no one will contend that if the avowed purpose of the defendant directors was to sacrifice the interests of shareholders it would not be the duty of the courts to interfere.

We are not, however, persuaded that we should interfere with the proposed expansion of the business

of the Ford Motor Company. In view of the fact that the selling price of products may be increased at any time, the ultimate results of the larger business cannot be certainly estimated. The judges are not business experts. It is recognized that plans must often be made for a long future, for expected competition, for a continuing as well as an immediately profitable venture. The experience of the Ford Motor Company is evidence of capable management of its affairs. It may be noticed, incidentally, that it took from the public the money required for the execution of its plan and that the very considerable salaries paid to Mr. Ford and to certain executive officers and employees were not diminished. We are not satisfied that the alleged motives of the directors, in so far as they are reflected in the conduct of the business, menace the interests of shareholders. It is enough to say, perhaps, that the court of equity is at all times open to complaining shareholders having a just grievance.

Assuming the general plan and policy of expansion and the details of it to have been sufficiently, formally, approved at the October and November, 1917, meetings of directors, and assuming further that the plan and policy and the details agreed upon were for the best ultimate interest of the company and therefore of its shareholders, what does it amount to in justification of a refusal to declare and pay a special dividend, or dividends? The Ford Motor Company was able to estimate with nicety its income and profit. It could sell more cars than it could make. Having ascertained what it would cost to produce a car and to sell it, the profit upon each car depended upon the selling price. That being fixed, the yearly income and profit was determinable, and, within slight variations, was certain.

There was appropriated — voted — for the smelter $11,325,000. As to the remainder voted there is no

available way for determining how much had been paid before the action of directors was taken and how much was paid thereafter, but assuming that the plans required an expenditure sooner or later of $9,895,000 for duplication of the plant, and for land and other expenditures $3,000,000, the total is $24,220,000. The company was continuing business, at a profit—a cash business. If the total cost of proposed expenditures had been immediately withdrawn in cash from the cash surplus (money and bonds) on hand August 1, 1916, there would have remained nearly $30,000,000.

Defendants say, and it is true, that a considerable cash balance must be at all times carried by such a concern. But, as has been stated, there was a large daily, weekly, monthly, receipt of cash. The output was practically continuous and was continuously, and within a few days, turned into cash. Moreover, the contemplated expenditures were not to be immediately made. The large sum appropriated for the smelter plant was payable over a considerable period of time. So that, without going further, it would appear that, accepting and approving the plan of the directors, it was their duty to distribute on or near the first of August, 1916, a very large sum of money to stockholders.

In reaching this conclusion, we do not ignore, but recognize, the validity of the proposition that plaintiffs have from the beginning profited by, if they have not lately, officially, participated in, the general policy of expansion pursued by this corporation. We do not lose sight of the fact that it had been, upon an occasion, agreeable to the plaintiffs to increase the capital stock to $100,000,000 by a stock dividend of $98,000,-000. These things go only to answer other contentions now made by plaintiffs and do not and cannot operate to estop them to demand proper dividends upon the stock they own. It is obvious that an annual

dividend of sixty per cent. upon $2,000,000, or $1,-$200,000, is the equivalent of a very small dividend upon $100,000,000, or more.

The decree of the court below fixing and determining the specific amount to be distributed to stockholders is affirmed. In other respects, except as to the allowance of costs, the said decree is reversed. Plaintiffs will recover interest at five per cent. per annum upon their proportional share of said dividend from the date of the decree of the lower court. Appellants will tax the costs of their appeal, and two-thirds of the amount thereof will be paid by plaintiffs. No other costs are allowed.

STEERE, FELLOWS, BROOKE, and STONE, JJ., concurred with OSTRANDER, J.

MOORE, J. (*concurring*). I agree with what is said by Justice OSTRANDER upon the subject of capitalization. I agree with what he says as to the smelting enterprise on the River Rouge. I do not agree with all that is said by him in his discussion of the question of dividends. I do agree with him in his conclusion that the accumulation of so large a surplus establishes the fact that there has been an arbitrary refusal to distribute funds that ought to have been distributed to the stockholders as dividends. I therefore agree with the conclusion reached by him upon that phase of the case.

BIRD, C. J., and KUHN, J., concurred with MOORE, J.