Betty **LEVIN** et al., Plaintiffs,

v.

**MISSISSIPPI RIVER CORPORATION** et al., Defendants.

No. 67 Civ. 5095.

United States District Court,
S. D. New York.

March 19, 1973.

See, also, D.C., 47 F.R.D. 294.

12. See footnote 2, *supra*.

Orans, Elsen & Polstein, Pomerantz, Levy, Haudek & Block, New York City, for plaintiffs Levin and LeVasseur; Sheldon H. Elsen, Abraham L. Pomerantz, John Lowenthal, William E. Haudek, Lewis Shapiro, New York City, of counsel.

Donovan, Leisure Newton & Irvine, New York City, for plaintiff Alleghany Corporation; John E. Tobin, M. Lauck Walton, Theodore E. Somerville, Glenn S. Koppel, New York City, of counsel.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendant Mississippi River Corp.; Everett I. Willis, Robert S. Wolf, Gerald E. Ross, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendants Missouri Pac. R. Co., Robert H. Craft, T. C. Davis and Thomas F. Milbank; David W. Peck, Michael M. Maney, Carroll E. Neesemann, New York City, of counsel.

Greenbaum, Wolff & Ernst, New York City, for Class B Objectors Edward Garfield and Barbara M. Garfield; Barron M. Tenny, Edward Garfield, New York City, of counsel.

Sixteen Other Class B Objectors, pro se.

Michael Paul Cohen, Chicago, Ill., for Class A Objectors Jacob R. Cohen and June Cohen.

EDWARD WEINFELD, District Judge.

This is a motion pursuant to Rules 23 and 23.1 of the Federal Rules of Civil Procedure for approval of a settlement agreement of a class action brought on behalf of Class B stockholders of the Missouri Pacific Railroad Company

(MoPac), an interstate railroad. The plaintiffs in the class action are Alleghany Corporation (Alleghany), the owner of a majority of the outstanding shares of Class B stock, and two individual owners of such stock, Betty Levin (Levin) and Robert LeVasseur (LeVasseur), who also assert derivative claims on behalf of and in the right of MoPac. The defendants include Mississippi River Corporation (Mississippi), the owner of a majority of the outstanding Class A stock of MoPac, and three individual defendants, directors of MoPac, two of whom are also directors of Mississippi. In the event the proposed settlement is approved, applications for allowance of attorneys' fees and expenses are to be considered following entry of final judgment.

## HISTORICAL BACKGROUND OF THE CLASS A AND CLASS B STOCK

The capitalization of MoPac has been the subject of controversy and litigation for almost forty years. The Class A and Class B stockholders have been at odds over their respective rights and interests over a substantial period. Their differences were accentuated by MoPac's restructured capitalization when in 1956 it emerged from reorganization proceedings filed in 1933. During those twenty-three years various proposed plans of reorganization failed to gain acceptance. Alleghany Corporation, the owner of about half of MoPac's then outstanding common stock, had opposed reorganization plans proposed in 1940, 1944 and 1949 because none provided for the old common stockholders. Finally, a fourth plan, referred to as an "Agreed System Plan," was proposed by the reorganization Trustee, approved by the Interstate Commerce Commission in 1954, accepted by Alleghany and other interests, and became effective March 1, 1956.[1] The plan, which then seemed to be an ingenious way to compose differences among various security and equity interests, contained provisions which some objectors predicted "are sure to cause trouble."[2] And so it has come to pass. The equity interests have been at odds and in litigation ever since.

MoPac's recapitalization upon its reorganization was structured so that the old preferred and common stock were replaced by two classes of stock, Class A and Class B. The Class A shares of the reorganized company were issued to the former preferred stockholders of MoPac, the debtor, with each share entitled to receive, when and as declared by the Board of Directors, noncumulative dividends, not to exceed $5 annually, and in the event of dissolution or liquidation, the first $100, together with any dividends declared and unpaid. The Class B shares were issued to the former common stockholders of the debtor, and after payment of the $5 dividend to the Class A stock, each share of Class B stock is entitled to receive dividends, without restriction, as the Board of Directors may

---

1. Missouri Pac. R. R. Reorganization, 290 I.C.C. 477 (1954), approved in In re Missouri Pac. R. R., 129 F.Supp. 392 (E.D.Mo.), aff'd sub nom. Missouri Pac. R. R. 5¼% S.S.B.C. v. Thompson, 225 F.2d 761 (8th Cir. 1955), cert. denied, 350 U.S. 959, 76 S.Ct. 347, 100 L.Ed. 833 (1956).

2. In re Missouri Pac. R. R., 129 F.Supp. 392, 397 (E.D.Mo.1955). ICC Commissioner Mahaffie was the first to predict trouble ahead. In his reluctant concurrence of the reorganization plan, he said:

"The prior class 'A' stock is limited as to dividends and is noncumulative. It will be largely of a speculative character for some years at best. But the 'B' stock is for the present, and for the foreseeable future, principally valuable as a token for speculation. Consequently, its relation to the 'A' stock and to the debentures and income bonds which precede it is reasonably sure to cause trouble."
Missouri Pac. R. R. Reorganization, 290 I.C.C. 477, 624–25 (1954).

declare, and upon liquidation or dissolution of MoPac, the equity in excess of the Class A preferences. Each share of each class is entitled to one vote. The former preferred stockholders received approximately 1.9 million shares and the former common stockholders received approximately 40,000 shares, so that 98% of the voting stock is held by the Class A stock and 2% by the Class B stock.

Obviously, the Class A stockholders have the power to elect MoPac's Board of Directors, as well as voting control with respect to other but not all corporate matters. On mergers, consolidations or reorganizations involving issuance of additional stock or the alteration of the rights of either class, approval by a majority of each class is required. Thus, in effect, the Class B stock has a veto power over such actions. In practical terms, the "ingenious" solution envisaged under the 1956 reorganization created a basic conflict between the two classes, with the equity ownership principally in the B stock, but with effective operating control in the A stock.

Mississippi began acquiring Class A stock in 1959 and by 1963 owned more than one million shares, constituting 58% of the outstanding Class A shares. It now owns 63%, or 1,158,395 shares out of a total outstanding of 1,864,052. Since 1963 it has elected the Board of Directors of MoPac. Alleghany, on the other hand, which has owned a majority of the outstanding Class B stock ever since it was issued upon the reorganization, now owns, subject to a voting trust, approximately 53%, or 21,243 shares, of the total outstanding 39,731 shares. Thus the disparity of interest between the two classes of stock is further aggravated by Alleghany's majority ownership of the B stock, which gives it an independent veto power over any corporate action that requires the separate approval of the B stock.

## THE VOTING RIGHTS LITIGATION

The first litigation that the differing stockholders became embroiled in after the reorganization came in December 1963, when MoPac's Board of Directors proposed the consolidation of MoPac and its 83% owned subsidiary, Texas and Pacific Railway Company (T & P), into a new corporation, Texas and Missouri Pacific Railroad Company (T & M). An application was filed with the Interstate Commerce Commission for an order under section 5(2) of the Interstate Commerce Act authorizing the proposed consolidation and for the issuance of securities by T & M under section 20a of the Act. The plan provided for an exchange of each MoPac share, regardless of class, for four shares of the new corporation and for an exchange of the T & P stock (other than that owned by MoPac) on the basis of one share of T & P for 4.8 shares of the new company. MoPac's Board of Directors took the position that the Class B stockholders were not entitled to vote on the plan separately and apart from the Class A stockholders, and that it intended to submit the plan for approval to the collective vote of the Class A and Class B stockholders. In view of Mississippi's ownership of a majority of the Class A stock, as well as all outstanding stock, the outcome of the vote on consolidation was virtually foreordained. Alleghany and other Class B stockholders filed actions in the United States District Court for the Eastern District of Missouri for a declaratory judgment that the plan required the approval of a majority of each of the two classes of stock and sought other relief. Upon a limited consolidation of the cases the district court held that MoPac's Articles of Association and the applicable federal and state law required the separate approval of each class of shareholders.[3] The Court of Appeals reversed, holding that separate class ap-

3. Slayton v. Missouri Pac. R. R., 233 F.Supp. 747 (E.D.Mo.1964).

proval was not required.[4] On certiorari, the Supreme Court unanimously reversed the Court of Appeals, holding that:

> "With reference to voting rights, we hold only that in a consolidation as proposed here, Missouri law must be applied and . . . that law requires the application of the Articles of Association of Mopac, which in turn, require the assent of the majority of the shareholders on a separate class-vote basis."[5]

Since a number of stockholders emphasize certain rhetorical statements in the Court's opinion,[6] it is well to bear in mind the Court's precise holding, and further its statement: "We do not . . . reach the merits of the proposed plan . . . ."[7] The Court's ruling ended the proposed consolidation when in March 1967 MoPac and T & P abandoned their plan, but further litigation was ahead.

## THE INSTANT ACTION

This action was instituted by plaintiff Levin in December 1967. Thereafter Alleghany and LeVasseur intervened pursuant to leave granted by this Court. In September 1968 Judge Bryan ordered that the action be maintained as a class action on behalf of all Class B stockholders. The thrust of the complaints of all three plaintiffs is directed toward the dividend policy with respect to the Class B stock. From 1964 to 1971 the annual dividends paid on the A stock have been $5 per share. During that same period annual dividends declared and paid on the Class B stock have been $5 per share.

In substance, three separate claims are asserted against Mississippi and the three individual defendants.[8] Under the first cause of action plaintiffs claim that the dividends declared and paid by MoPac have been unreasonably low; that Mississippi has misused its majority voting stock power by causing MoPac's Board of Directors to limit dividends on the Class B stock to $5, the maximum permissible per share dividend payable on the Class A stock, despite the enormous differences in the equity value between the two classes, and notwithstanding the availability in each year of net income for increased dividends after meeting the requirements on the Class A stock.

The second cause of action charges a conspiracy by Mississippi and members of MoPac's Board of Directors to "freeze out" the Class B stockholders by improperly limiting the dividends paid on the Class B stock, making public statements denigrating the market value of the Class B stock, and attempting to appropriate the equity of the Class B stockholders through the plan of consolidation of MoPac with T & P, proposed in 1963.

The third cause of action further alleges that the various acts and conduct alleged in the second cause of action were in violation of section 10(b) of the Securities Exchange Act of 1934, and Rule 10b–5, promulgated thereunder, and of defendants' common law fiduciary duty owed the Class B stockholders. The plaintiffs seek judgment that the Court direct MoPac to pay reasonable dividends for the past years, from 1964 to 1971, to all Class B stockholders; that MoPac be directed to pay reasonable dividends on the Class B stock in the future; and to award plaintiffs their costs,

4. Mississippi River Fuel Corp. v. Slayton, 359 F.2d 106 (8th Cir. 1966).

5. Levin v. Mississippi River Fuel Corp., 386 U.S. 162, 170, 87 S.Ct. 927, 932, 17 L.Ed.2d 834 (1967).

6. *See, e. g., id.* at 169, 87 S.Ct. at 931: "The plan proposes to exchange four shares of stock of T & M for one share of MoPac Class B, which . . .

is like exchanging four rabbits for one horse."

7. *Id.* at 170, 87 S.Ct. at 932.

8. Plaintiff Levin also attacks the failure of defendants to split the Class B stock or to take similar steps to improve its marketability; however, no specific relief is sought.

expenses and reasonable counsel fees incurred in the prosecution of this action.

In addition to the class action claims, Levin and LeVasseur separately assert derivative claims on behalf of MoPac. One alleges that the defendants have failed to cause MoPac to replace the Class A stock with debentures or other interest bearing securities, which would materially reduce MoPac's income tax; however, as to this derivative claim, no specific relief is sought. A further derivative claim on behalf of MoPac is for the recovery of the costs and expenses incurred by it in connection with the 1963 T & P consolidation plan and the Class B voting rights action.

The defendants in their answers have denied the material allegations of the complaints and set up affirmative defenses, including, with respect to the dividend cause of action, business justification.

With the issues thus posed, the parties engaged in extensive pretrial discovery procedures commencing in 1968. The case was assigned to this Court in mid-year 1972, and after a pretrial conference the trial was scheduled to commence on December 4, 1972. As the trial date approached, the litigants had virtually completed all pretrial activities, which included depositions of parties and witnesses, as well as interrogatories propounded to one another, which in due course were answered. In addition, plaintiffs had obtained, read and evaluated approximately 10,000 pages of documents from the files of MoPac and related sources. The inspection of these documents took over ninety man-days' work by plaintiffs' counsel and additional time by an accountant and securities expert, retained specially for that purpose. It is evident that the pretrial discovery on both sides was as thorough as could be and all pertinent facts exposed by the litigants in preparation for a contested trial. While engaged in concluding their expanded pretrial activities, the parties concurrently intensified efforts to effect an amicable settlement. Previously, during the pendency of this case, and even before, attempts to reach an accommodation had failed. The renewed extended negotiations were participated in not only by the lawyers representing the parties, executives and financial officers of the corporations involved, but also by independent financial analysts and investment advisers specializing in corporate and transportation finance. The negotiators recognized that central to a lasting resolution of the conflict between the two stockholder interests was the elimination of the underlying cause of the strife, a result not obtainable whatever the final outcome were the case to proceed to trial, and it was this concept which led to a settlement on the basis of a restructed capitalization.

## THE TERMS OF THE PROPOSED SETTLEMENT

If the settlement is approved by the Court, a Plan of Recapitalization (Plan) and a proposed Amendment to MoPac's Articles of Association are to be submitted to stockholders for their approval, to bring about the following:

(1) each share of Class A stock would be converted into one share of $5 cumulative preferred stock, with a liquidating preference of $100 per share, convertible into one share of new common after one year following ICC authorization of the issuance of new securities and redeemable at the option of MoPac for $100 per share, after December 31, 1975. This would require the issuance of 1,864,052 shares of the new stock to the present holders of the Class A stock, of which Mississippi would be entitled to receive 1,158,395 shares;

(2) each share of Class B stock would be converted into sixteen shares of new common stock and $850 cash. This would require the issuance of 635,696 shares of new common stock to the present holders of Class B stock, of which Alleghany would be entitled to receive 339,-

888 shares; this would require a cash payment by MoPac of $33,771,350;

(3) both preferred stock and common stock would have one vote per share;

(4) the Plan and amendment would have to be approved by 75% of the outstanding shares of each class of MoPac stock, including a majority of the shares of each class other than those held by Mississippi and Alleghany—that is, a majority of the minority stockholders of each class;

(5) the issuance of the new shares would have to be approved by the Interstate Commerce Commission;

(6) upon such approvals, Mississippi is required to make a cash tender offer to all Class B stockholders for at least 400,000 shares (approximately 63%) of the new common stock, at $100 per share, and Alleghany (but not the minority B shareholders) must tender all its new common stock (339,888 shares). If more than 400,000 shares are tendered, Mississippi may purchase the shares on a pro rata basis; this would require a cash payment by Mississippi of at least $40,000,000;

(7) all claims asserted in this action and any other claims against the defendants which are based upon or arise from any of the matters alleged in the complaints, regardless of the legal theory upon which they are based, will be dismissed with prejudice;

(8) fees awarded to plaintiffs' attorneys will be paid by MoPac and Mississippi.

If the recapitalization and tender offer are not consummated by December 31, 1973, the settlement agreement would be terminable at the option of Alleghany, Mississippi or MoPac.

## EVALUATION OF THE SETTLEMENT

The function of the Court on this application for approval of the settlement is not, as some objectors suggested at the hearing and others have since urged in their communications to the Court, to reopen and enter into negotiations with the litigants in the hope of improving the terms of the settlement to meet their respective objections; nor is the Court called upon to substitute its business judgment for that of the parties who worked out the settlement.[9] So, too, the Court is cautioned not to turn the settlement hearing into a trial or a rehearsal of a trial.[10] To do so would defeat the very purpose of the compromise to avoid a determination of the sharply contested issues and to dispense with expensive and wasteful litigation. The Court's role is a more "delicate one," [11] which requires a balancing of likelihoods rather than an actual determination of the facts and law in passing upon whether the proposed settlement is fair, reasonable and adequate to the Class B stockholders and MoPac.[12] This appraisal requires the Court to reach "an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated" and to "form an educated estimate of the complexity, expense, and likely duration of such litigation . . . and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance . . . is the need to compare the terms of the compromise with the likely re-

9. Schleiff v. Chesapeake & O. Ry., 43 F.R.D. 175, 178 (S.D.N.Y.1967); Glicken v. Bradford, 35 F.R.D. 144, 151 (S.D. N.Y.1964).

10. Newman v. Stein, 464 F.2d 689, 692 (2d Cir.), cert. denied Benson v. Newman, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972).

11. *Id.* at 691; *see also* United Founders Life Ins. Co. v. Consumers Nat'l Life Ins. Co., 447 F.2d 647 (7th Cir. 1971).

12. *See* Zerkle v. Cleveland-Cliffs Iron Co., 52 F.R.D. 151, 159 (S.D.N.Y.1971).

wards of litigation."[13] With that guidance, we turn to the task at hand.

■ At the outset is the simple fact that the interests of each class of stockholders is tied up with the welfare of MoPac. Its operating efficiency and its competitive strength spell out economic success, which alone gives value to its stock, whatever the class. MoPac is in competition with a number of railroads, some of which, following trends in the industry and consistent with the congressional policy of encouraging consolidation of the nation's railroads into a limited number of systems,[14] have merged with other lines to effect economies and to improve efficiency. Other competitors are in the process of effecting consolidations. These merged, and the likely to be merged, competitors pose a potential threat to MoPac by depriving it of all but its short haul market and in other respects—as MoPac's chief executive officer states, "[it] could prove competitively ruinous." There can be little doubt that to maintain its competitive strength it is imperative that MoPac link itself with another system. Yet its efforts in this direction have been thwarted because of the disparate interests of the two classes of shareholders. Specific instances have been cited where other railroads have shied away from proposed consolidations because of the stockholders situation.

MoPac, to protect its competitive position against merged and other competing lines, has purchased through the years controlling securities of other railroads, a matter discussed hereafter. However, the stock acquisition method does not yield all the advantages of a merger. The elimination of the present capital structure with its built-in conflict between the two classes, which has foreclosed merger to date, will permit MoPac's officials to pursue merger prospects; it will also permit its officials to function full time in its interests and its stockholders—thousands upon thousands of hours have been devoted to litigation instead of to railroad operation.[15]

Another benefit favoring the settlement is that it provides the effective means for payment of greater dividends and thus meets in part the demands of plaintiffs. The Board of Directors anticipates that the annual dividend rate will be $5 per share on each class of stock to be issued under the Plan. With the Class B stockholders receiving sixteen shares new stock for their present one share (in addition to the $850 cash), the dividend return will be $80 per annum as against the current $5 per share. Mississippi, committed to the purchase of at least 400,000 shares of the new common stock (apart from such additional common stock it may own by reason of conversion of its preferred after one

13. Protective Comm. v. Anderson, 390 U.S. 414, 424–425, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968). *Accord,* Newman v. Stein, 464 F.2d 689, 692 (2d Cir.), cert. denied, Benson v. Newman, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972); Saylor v. Lindsley, 456 F.2d 896, 904 (2d Cir. 1972); West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079, 1085 (2d Cir.), cert. denied, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). With regard to weighing the benefits of the compromise against the likely rewards of litigation, *see* Purcell v. Keane, 54 F.R.D. 455, 460 (E.D.Pa. 1972); Glicken v. Bradford, 35 F.R.D. 144, 152 (S.D.N.Y.1964). *But cf.*

Norman v. McKee, 431 F.2d 769, 774 (9th Cir. 1970), cert. denied I.S.I. Corp. v. Myers, 401 U.S. 912, 91 S.Ct. 879, 27 L.Ed.2d 811 (1971).

14. *See* Penn Central Merger and N. & W. Inclusion Cases, 389 U.S. 486, 492, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968); *see also* N.Y. Times, Feb. 16, 1973, at 1, col. 7.

15. *Cf.* Denicke v. Anglo Cal. Nat'l Bank, 141 F.2d 285, 288 (9th Cir.), cert. denied, 323 U.S. 739, 65 S.Ct. 44, 89 L.Ed. 592 (1944); Derdiarian v. Futterman Corp., 38 F.R.D. 178, 181 (S.D.N.Y. 1965).

year) would have an economic interest in the declaration of dividends on the new common stock.

Other advantages are evident. The conversion of the Class B stock into sixteen shares makes them more marketable and to this extent meets the derivative claim that the defendants failed to split the Class B stock, thereby broadening public interest in it. Additionally, at the present time the Class B stock elects no directors. Under cumulative voting the new common stock would have the means of representation on the Board of Directors.

■ We next consider a, if not the, most important factor—the probability of plaintiffs' success upon a trial, and, if successful, "the likely rewards of [the] litigation." The extensive pretrial discovery conducted by the parties has exposed their respective strengths and weaknesses.[16] While each litigant professes confidence in his cause, it is with recognition of the force of a countervailing position and also, as all are aware, that "[s]tockholder litigation is notably difficult and unpredictable."[17]

■ Plaintiffs have the burden of proof as to their claims. To prevail, they must establish under the allegations of their complaints that MoPac's Board of Directors, in subservience to the wishes of Mississippi, abused their discretionary powers and arbitrarily and unreasonably withheld dividends in each

year, although MoPac's condition warranted such additional dividends.[18] Since the determination of whether a dividend should be declared rests in the first instance with the Board of Directors,[19] courts may intervene only when there has been bad faith, neglect or abuse of discretion.[20] This is indeed a heavy burden,[21] which plaintiffs' experienced counsel frankly acknowledge. However, they stress that in each year after payment of debt, other corporate requirements and dividends on the Class A stock, substantial earnings were available to pay a much higher dividend than $5 on the Class B stock. This by itself, however, would not carry the day for the plaintiffs. The directors who were deposed swore that the declaration of dividends in each year was based upon prudent business judgment, which took into account MoPac's current and long range needs. This basically is the defense to plaintiffs' charges. The defendants emphasize that since the merger route was foreclosed to MoPac, it was essential, in order to protect its competitive position, to purchase large blocs of securities in other railroads, which required large cash expenditures; also that cash was used or required for equipment, up to date maintenance, capital improvement programs, current and projected, as well as other purposes vital to MoPac's competitive standing. To underscore their defense of prudent business judgment, the defendants refer to MoPac's Articles

16. *Cf.* Saylor v. Lindsley, 456 F.2d 896, 901 (2d Cir. 1972); Cherner v. Transitron Electronic Corp., 221 F.Supp. 48, 51 (D.Mass.1963).

17. Zerkle v. Cleveland-Cliffs Iron Co., 52 F.R.D. 151, 159 (S.D.N.Y.1971); *cf.* Ferguson v. Birrell, 190 F.Supp. 506, 509 n. 10 (S.D.N.Y.1960), aff'd sub nom. Ferguson v. Tabah, 288 F.2d 665 (2d Cir. 1961).

18. *Cf.* Guttman v. Illinois Cent. R.R., 91 F.Supp. 285 (E.D.N.Y.1950), aff'd, 189 F.2d 927 (2d Cir.), cert. denied, 342 U.S. 867, 72 S.Ct. 107, 96 L.Ed. 652 (1951); W. Q. O'Neall Co. v. O'Neall, 108 Ind. App. 116, 25 N.E.2d 656 (1940); Dodge

v. Ford Motor Co., 204 Mich. 459, 170 N.W. 668 (1919); Walsh v. Walsh, 285 Mo. 181, 226 S.W. 236, 245 (1920); Patton v. Nicholas, 154 Tex. 385, 279 S.W.2d 848 (1955).

19. *See* Wabash Ry. v. Barclay, 280 U.S. 197, 203, 50 S.Ct. 106, 74 L.Ed. 368 (1930); *see also* New York, L. E. & W. R.R. v. Nickals, 119 U.S. 296, 307, 7 S.Ct. 209, 30 L.Ed. 363 (1886).

20. *See* Dodge v. Ford Motor Co., 204 Mich. 459, 170 N.W. 668, 681–682 (1919); 11 W. Fletcher, Private Corporations § 5325 (rev. ed. 1971) and cases cited therein.

21. Staats v. Biograph Co., 236 F. 454, 457 (2d Cir. 1916).

of Association which give the Board of Directors broad powers to set aside reserves and make such other provisions as the Board "shall deem to be necessary or advisable for working capital, for expansion of the business of the Company . . . and for any other purpose of the Company." [22]. The Court has reviewed the pretrial material on the issue of prudent business judgment and the defendants' position thereon cannot be said to be lacking in substance. In any event, it points up the issue as a substantial one to be resolved upon a trial. Plaintiffs, upon the whole case, would have the burden of establishing that the directors, notwithstanding the explanation of the factors which influenced their judgment, were in fact acting in bad faith or in an arbitrary manner. Directors are permitted a very liberal discretion in determining matters of business policy.[23] And if that discretion has been exercised in good faith, that it may have been injudicious or even if the Court believed a different policy were desirable, would not, by itself, be sufficient to sustain plaintiffs' burden.[24]

Moreover, even if plaintiffs should prevail upon the merits on the issue of additional dividends, it would not necessarily mean a total recovery. The Court would face the question of determining what would have constituted adequate dividends *in each year* during the period from 1964 through 1971—a decision requiring consideration of numerous variables, making the likelihood of substantial recovery questionable. The problem, as acknowledged by all parties, is difficult of solution. As counsel for Alleghany recognizes:

"Thus, if a finding of wrongdoing were made, there would remain the problem of proving the amount of additional dividends which should have been paid. The effect of this difficult problem of proof on the outcome of the lawsuit might well depend upon which party was deemed to have the burden of proof. If plaintiffs were required to prove that the dividends paid by MoPac were inadequate, that burden could have remained unmet and recovery could have been denied. On the other hand, if defendants were required to prove the adequacy of the dividends paid, they might well have failed to meet that burden, and as a result plaintiffs might have won a substantial recovery." [25]

Plaintiffs' problems are further compounded since it is doubtful that the Court would retain jurisdiction, as plaintiffs request, in order to monitor the MoPac Board's future dividend policy which, initially, is the Board's responsibility. Such future judicial supervision of MoPac's dividend policy would require the Court to make complex business decisions from year to year as to amounts to be retained out of earnings in order to determine the net income

---

22. MoPac's Articles of Association, Article VII D(1).

23. *Cf.* Fielding v. Allen, 99 F.Supp. 137, 142 (S.D.N.Y.1951); Dodge v. Ford Motor Co., 204 Mich. 459, 170 N.W. 668, 681–682 (1919); Park v. Grant Locomotive Works, 40 N.J.Eq. 114, 117–118, 3 A. 162, 165 (Ch.1885), aff'd, 45 N.J. Eq. 244, 19 A. 621 (Ct.Err. & App.1888); Leslie v. Lorillard, 110 N.Y. 519, 532, 18 N.E. 363, 365 (1888); Casey v. Woodruff, 49 N.Y.S.2d 625, 643 (Sup. Ct. 1944).

24. *Cf.* Taussig v. Wellington Fund, Inc., 313 F.2d 472, 479 (3d Cir.), cert. denied,

374 U.S. 806, 83 S.Ct. 1693, 10 L.Ed.2d 1031 (1963); Everett v. Phillips, 288 N.Y. 227, 43 N.E.2d 18 (1942); Bourne v. Bourne, 240 N.Y. 172, 177–178, 148 N.E. 180, 181 (1925); Gallagher v. New York Dock Co., 19 N.Y.S.2d 789, 800–801 (Sup.Ct.1940), aff'd, 263 A.D. 878, 32 N.Y.S.2d 348 (2d Dep't 1942); *see also* Briggs v. Spaulding, 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662 (1891); Masterson v. Pergament, 203 F.2d 315, 330 (6th Cir.), cert. denied, 346 U.S. 832, 74 S.Ct. 33, 98 L.Ed. 355 (1953).

25. Affidavit of M. Lauck Walton, Jan. 23, 1973, at 23.

available for the declaration of dividends. In end result, were the Court to retain jurisdiction, it would be required to function as MoPac's sole director in place of its duly elected Board of Directors.

Some objectors cite Dodge v. Ford Motor Co.,[26] as giving strength to plaintiffs' position. However, that court adopted the general principle against judicial intervention in corporate affairs. The *Dodge* court did conclude that plaintiffs had produced sufficient evidence to prove that the directors were running the corporation for the benefit of persons other than the stockholders and therefore justified in requiring the payment of reasonable dividends. The facts of the *Dodge* case are by no means similar to those in the instant case. Similarly, Mayflower Hotel Shareholders Protective Committee v. Mayflower Hotel Corp.,[27] merely demonstrates that the plaintiffs have alleged a valid cause of action, not necessarily a successful one.

As to the conspiracy charge—that Mississippi conspired with others by various acts and means to "freeze out" the Class B stockholders or to depress the market price of the stock—plaintiffs face perhaps an even heavier burden, since it is conceded that no tangible or direct evidence has thus far been unearthed to sustain the charge; perforce, plaintiffs would have to rely upon circumstantial evidence and urge that the fact finder draw inferences therefrom of wrongful motive and conspiratorial conduct.

The third cause of action, based upon defendants' acts and conduct in connection with the alleged conspiracy to "freeze out" the B shareholders and allegedly resulting in violations of section 10(b) of the Securities Exchange Act, the rule thereunder and defendants' common law fiduciary duties, also presents problems of proof for plaintiffs. Plaintiffs here charge that during the existence of the alleged conspiracy Mississippi and the defendant T. C. Davis bought and sold shares of B stock; that the objective of the scheme was to depress the market of the B stock, thereby forcing plaintiffs to sell at prices much below their true value. Even considering the current liberalization of Rule 10b–5,[28] and that plaintiffs' position may have some support,[29] plaintiffs must carry the burden of proving that defendants' actions were fraudulent [30] or unjustified,[31] and that such conduct in some way caused plaintiffs' injury.[32] As to the latter, it is interesting to note that plaintiffs do not seek separate relief on their 10b–5 claim; instead, they urge that the damages be measured by the amount of reasonable dividends allegedly withheld by the defendants during 1964–1971. By invoking this measure of damages, plaintiffs also face the same problems already discussed as to the extent of recovery under the dividend cause of action.

As to the derivative causes of action, one claim seeks to hold Mississippi and the individual defendants accountable for the expenses incurred by MoPac in con-

---

26. 204 Mich. 459, 170 N.W. 668 (1919).

27. 84 U.S.App.D.C. 275, 173 F.2d · 416 (1949).

28. *See, e.g.*, Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed. 2d 128 (1971).

29. *See* Cochran v. Channing Corp., 211 F.Supp. 239 (S.D.N.Y.1962).

30. *See* List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

31. As to justification, the same problems will be encountered here as in the dividend cause of action.

32. *Cf.* Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 12–13, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540, 546 (2d Cir. 1967).

nection with the plan to consolidate MoPac with T & P, which was abandoned following the Supreme Court decision. Even were the plaintiffs to establish that the proposed consolidation was not in MoPac's interest but calculated to favor Mississippi,[33] the likelihood of recovery on this claim is diminished by the holding by the Eighth Circuit Court of Appeals that MoPac was not responsible to the plaintiffs for their legal fees and expenses in the voting rights litigation.[34] Additionally, plaintiffs would be hard put to prove that the proposed consolidation of MoPac with T & P was not a justifiable business decision by the MoPac Board. As already noted, the Supreme Court expressly disavowed that it passed upon the merits of the proposal.

To state all the foregoing, of course, is no forecast of result upon a trial. It is simply to recognize, as the principals themselves do, that the action presents many obstacles, particularly for plaintiffs, who have the burden of proof. With the defendants vehemently denying wrongful conduct, were the case to be tried, all the issues would be vigorously contested, with the outcome obviously uncertain. The probability of ultimate success at best can only be cautious prophecy.

Having examined the benefits of the settlement and the prospect of success upon a trial, other factors merit consideration. As all parties stress, were the plaintiffs to prevail upon the trial, or whatever its outcome, there would still remain the root cause of the conflict between the two classes of stockholders—the separation between equity ownership (principally in the B stock) and management control (in the A stock). And as long as it exists there will be continued hostility between the two and the potential of renewed litigation. Its elimination will be an advantage to all concerned. The settlement also provides for the elimination of Alleghany's ownership of equity stock, which Mississippi is to acquire. With Alleghany no longer an opposing force, it should mean stability in management and operation of MoPac.

Another factor favoring the settlement, but by no means determinative,[35] is the unanimous judgment of all the parties, their counsel and their investment analysts and advisers that its terms are eminently fair. To be sure, the final judgment as to the fairness of the proposal is the responsibility of this Court, but their joint recommendation is entitled to substantial weight,[36] particularly so in the instant case. A unique situation exists here not present in the usual stockholders' suit recommended to the courts for settlement, where ofttimes the plaintiffs representing the class own a relatively small economic interest in the corporation. Alleghany's self-interest as the owner of 53% of the Class B stock gives some assurance that it negotiated to obtain the best possible terms for that group viz-a-viz the Class A stockholders.[37] The other two plain-

33. As to the merits, the Court of Appeals for the Eighth Circuit recognized the issues in the voting rights litigation were complex and that no court had passed upon the fairness of the plan itself. Missouri Pac. R.R. v. Slayton, 407 F.2d 1078, 1082, 1083 (8th Cir.), cert. denied, Alleghany Corp. v. Missouri Pac. R.R. Co., 395 U.S. 937, 89 S.Ct. 1998, 23 L.Ed.2d 451 (1969).

34. Missouri Pac. R.R. v. Slayton, 407 F.2d 1078 (8th Cir.), cert. denied, Alleghany Corp. v. Missouri Pac. R.R., 395 U.S. 937, 89 S.Ct. 1998, 23 L.Ed.2d 451 (1969).

35. Cf. Cohen v. Young, 127 F.2d 721, 725 (6th Cir. 1942).

36. See Cannon v. Texas Gulf Sulphur Co., 55 F.R.D. 306, 316 (S.D.N.Y.1971); Percodani v. Riker-Maxson Corp., 50 F.R.D. 473, 477 (S.D.N.Y.1970); Schleiff v. Chesapeake & O. Ry., 43 F.R.D. 175, 179 (S.D.N.Y.1967); Glicken v. Bradford, 35 F.R.D. 144, 152 (S.D.N.Y.1964); Fielding v. Allen, 99 F.Supp. 137, 144 (S.D.N.Y.1951).

37. Cf. Cherner v. Transitron Electronic Corp., 221 F.Supp. 48, 51 (D.Mass.1963).

tiffs, minority Class B stockholders, each also owns a substantial number of shares reflecting a heavy investment in the stock. Their counsel have acted independently of Alleghany's counsel in representing the interests of the Class B minority shareholders. These three plaintiffs and their counsel over a long period have been alert to enforce the rights of Class B stockholders. The lawyers for the plaintiffs in this action also represented them in the Missouri voting rights case and, over Mississippi's strong opposition, successfully upheld the right of the Class B stockholders as a separate group to vote upon consolidations. They are particularly knowledgeable with respect to the basic facts of MoPac and the hard core issues of this litigation; they are especially experienced in this field of law. Additionally, the parties, during the course of the litigation and in the negotiations, had the benefit of the advice of experienced independent railroad investment advisers and analysts. The record leaves no room to doubt that the negotiations were conducted in good faith and at arms length, with the Class B stockholders represented by sophisticated, if not hardened, negotiators who deem the settlement the best result obtainable without a trial of the issues on the merits.[38]

Finally, the fairness of the settlement is emphasized by the provision that, despite Mississippi's and Alleghany's ef-

fective voting control by reason of their respective majority ownership of the Class A and B stock, sufficient under MoPac's charter to put through a recapitalization, the Plan cannot be effected without the approval of a majority of the other stockholders of each class [39]— in effect, acceptance of the settlement rests with them regardless of the desires of Mississippi and Alleghany.

The factors militating in favor of the settlement are indeed substantial, but a number of Class B stockholders challenge it as unfair and inadequate.

### THE OBJECTIONS

At the hearing on this motion, Class B stockholders or their attorneys appeared and others communicated with the Court by letter to voice their objections to approval of the Plan. There are eighteen objectors who own a total of approximately 1,167 shares.[40] They concentrate their attack on the alleged inadequacy of the exchange for their holdings; its tax consequences; they also contend the settlement is unfair as between them and Alleghany as the majority Class B stockholder. Almost all the objectors agree that the litigation should be settled, but on better terms than those proposed; failing that, they urge rejection of the settlement.

The primary objection is that the package exchange of $850–16 shares of new

**38.** *Cf.* Mutual Shares Corp. v. Genesco, Inc., [1967–1969 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 92,315 (S.D.N.Y.1968); Cherner v. Transitron Electronic Corp., 221 F.Supp. 48, 51 (D.Mass.1963).

The fact that the form of the settlement decided upon is somewhat unusual and that it includes some benefits which cannot be evaluated in financial terms does not militate against its acceptance; the parties are permitted great freedom in shaping the form of settlement consideration. *Cf.* Derdiarian v. Futterman Corp., 38 F.R.D. 178 (S.D.N.Y.1965); Manacher v. Reynolds, 39 Del.Ch. 401, 165 A.2d 741, 747 (Ch.1960); Levey v. Babb, 39 Misc.2d 648, 241 N.Y.S.2d 642 (Sup.Ct.1963).

**39.** *Compare* Winkelman v. General Motors Corp., 48 F.Supp. 490, 495 (S.D.N.Y. 1942).

**40.** The 39,371 outstanding Class B shares are held by some 950 individuals or corporations. That a comparatively small number of holders of shares reflecting a small percentage of the total outstanding oppose, as against a great majority who favor, the settlement does not relieve the Court of its function in passing upon the fairness of the proposal. *See* Protective Comm. v. Anderson, 390 U.S. 414, 435, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *cf.* American United Mutual Life Ins. Co. v. City of Avon Park, 311 U.S. 138, 148, 61 S.Ct. 157, 85 L.Ed. 91 (1940).

common stock for each share of present Class B stock yields substantially less than the value of the shares to be surrendered. The substance of this challenge rests principally upon the existing rights of the Class B stock as against those of the Class A stock. A major premise in the objectors' attack is their view that realistically the Class A stock is a noncumulative preference stock limited to a $5 per year dividend and to $100 per share upon liquidation; that realistically the Class B stock is the common stock entitled to unlimited dividends as may be declared and to all MoPac's equity above the $100 per share attributable to the Class A stock. These differences are the hard core of the objectors' valuation and other contentions. However, merely to state the differences in rights between the two classes of stock is too simplistic an approach; countervailing factors cannot be ignored. A factor of force is that the Class A stock, whether termed a "preference" or "hybrid" stock, or otherwise, has one vote per share, just as each share of Class B stock, with the result that the Class A stock not only controls the management of MoPac, but also can and, as plaintiffs charge, does exercise this control to withhold dividends from the Class B stock, whereas the Class B stock, a small minority of all outstanding shares, has the veto power over mergers, consolidations and other important corporate actions, and yet it is without sufficient voting strength to elect even one director. Another countervailing factor which cannot be disregarded is that the Class A stock, while noncumulative, is entitled to receive dividends out of retained earnings in each year even if current earnings for a particular year may be insufficient to cover dividend requirements on the A stock. Consideration of the objectors' contentions with respect to the value of their stock cannot ignore these elements. Thus we turn to the specific objections.

Almost all the parties are in accord that the new common shares can be valued at about $100 per share, so that the $850–16 share package conversion rate equals approximately $2,450 for each present Class B share. But objectors and proponents differ on the present value of the B stock, as well as the A stock. It would serve no useful purpose to analyze in detail their computations whereby they evaluate the present worth of each class. Their differing estimates derive from the methods used to value the shares.

Most objectors evaluate the shares by their book value. Several apply the capitalization of net earnings method; in this instance, they allocate to the Class B stock all of MoPac's annual net earnings above the annual Class A dividend requirements. Their position is that the earnings of the Class A stock cannot exceed its maximum dividend, that is, $9,319,000, or $5 per share, and consequently the balance of each year's earnings should be allocated to the Class B stock. By their respective methods the objectors calculate that the present worth of each share of Class B stock ranges from somewhat over $4,000 to the unrealistic, if not astronomical, figure of $25,000. Those objectors who capitalize net earnings as allocated by them to the Class B stock estimate, at a price-earnings ratio of 10–1, its value at $4,450 per share. At a 9–1 ratio, it would be $4,005 per share (1972 earnings).

The proponents, in evaluating the present worth of the two classes of stock, also apply the capitalization of recent earnings method (1971–1972). However, their method of allocation of earnings differs from that of the objectors. Instead of deducting the Class A maximum annual dividend requirement from net earnings, the proponents take into account the market value of the Class A stock, which shortly before the announcement of the settlement, was selling be-

tween $70–75 per share.[41] They capitalize MoPac's earnings for the two years on a 9–1 basis, resulting in its capitalized value of $225,000,000 to $243,000,000. The market value of the Class A stock is deemed its true value, and accordingly its aggregate market value is deducted from MoPac's capitalized value and the difference allocated to the Class B stock, with the end result that the Class B stock is valued at an average of $2,365 per share; a 10–1 capitalization rate would bring the average value somewhat higher.

■ ■ Before considering the respective contentions, it is desirable to emphasize the Court's function on this application, already referred to; particularly so, since a number of objectors advance their arguments of stock valuation as if this were a proceeding under section 77 of the Bankruptcy Act,[42] where the phrase "fair and equitable," a term of art,[43] requires recognition of priority rights of senior securities owners on the basis of full compensatory value. The Court here is not called upon to make a definitive assessment of the value of each class of stock, old or new—that is not even a requirement were the proceeding one under section 77,[44] where with its standard of "fair and equitable," it is recognized that "the pretenses of exactitude" in determining a dollar value for a railroad property is somewhat illusory.[45] The Court here is concerned with a proposed settlement of a lawsuit and whether its terms, taking into account the probabilities of success upon a trial, and all pertinent factors, are "fair, reasonable, and adequate . . . terms [that] are general and cannot be measured scientifically."[46] In passing upon a proposed settlement of a stockholder's litigation, the standard "fair, reasonable and adequate" is not to be equated with "fair and equitable," applicable to a proposed railroad reorganization under the Bankruptcy Act. In the compromise of a stockholder's lawsuit there necessarily come into play "practical adjustments,"[47] elements of give and take by the respective interested parties, depending upon their strengths and weaknesses in the litigation;[48] and, of course, the uncertainty of its outcome, as well as the rewards, if successful, are important considerations in the process of compromise and concession.

■ ■ First, as to book value as a method of valuation. The authorities are in agreement that book value is of little significance in appraising the value of stock; that what is of prime significance is a corporation's earning potential based on past experience.[49] The contention made by the objectors as to the change in equity between the two classes of stock is related to the book value concept. There appears to be no dispute that should the new preferred

41. Consideration was given to the effect of the public announcement of the proposed settlement.

42. 11 U.S.C. § 205.

43. Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 115, 60 S.Ct. 1, 84 L.Ed. 110 (1939).

44. See Group of Institutional Investors v. Chicago, M. St. P. & Pac. R. R., 318 U.S. 523, 564–565, 63 S.Ct. 727, 87 L.Ed. 959 (1943).

45. Id. at 565, 63 S.Ct. 727.

46. West Virginia v. Chas. Pfizer & Co., 314 F.Supp. 710, 740 (S.D.N.Y.1970), aff'd, 440 F.2d 1079 (2d Cir.), cert. denied, 404

U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971).

47. Cf. Group of Institutional Investors v. Chicago, M., St. P. & Pac. R. R., 318 U.S. 523, 565, 63 S.Ct. 727, 87 L.Ed. 959 (1943).

48. See Masterson v. Pergament, 203 F.2d 315, 330 (6th Cir.), cert. denied, 346 U.S. 832, 74 S.Ct. 33, 98 L.Ed. 355 (1953); Percodani v. Riker-Maxson Corp., 50 F.R.D. 473, 477 (S.D.N.Y.1970).

49. Cf. Ecker v. Western Pac. R. R., 318 U.S. 448, 483, 63 S.Ct. 692, 87 L.Ed. 892 (1943); Consolidated Rock Prods. Co. v. Du Bois, 312 U.S. 510, 525–526, 61 S.Ct. 675, 85 L.Ed. 982 (1941).

(1,864,052) shares be converted into new common, the equity position of the B stockholders would be reduced from 61½% to 25½%. The objectors and proponents differ as to the importance of the shift in equity. The terms equity and book value are essentially synonymous.[50] They would have relevance if there were the prospect of MoPac's liquidation[51] or a takeover of the railroads by the government. Neither liquidation nor the nationalization of the railroads of the country is an imminent likelihood. Judge Learned Hand's sage observation of the fallacy of measuring the value of shares by their book value is as sound today as when he stated it almost fifty years ago:

> "The suggestion that the book value of the shares is any measure of their actual value is clearly fallacious. It presupposes, first, that book values can be realized on liquidation, which is practically never the case; and, second, that liquidation values are a measure of present values. Everyone knows that the value of shares in a commercial or manufacturing company depends chiefly on what they will earn, on which balance sheets throw little light. . . ."[52]

Next, as to the capitalization of earnings method, it has been already noted that the difference in valuation between objectors and proponents of the Class A and Class B stock results from different methods of allocating earnings to the two. Since the matter is one of judgment, there is room for disagreement. The Court has examined the submissions of the parties on this subject and is persuaded that the method of valuation, which takes into account the market value of the Class A shares and the underlying factors in its support offered by an expert retained to give an independent evaluation, is of substance and merits consideration.[53] The expert, after taking into account the market value of the Class A stock, valued the Class B stock at $2,365 per share.[54]

■ The Class A stock is listed on the New York Stock Exchange, is traded in a broad market, and almost 700,000 shares are held by the public. With an active market for the Class A stock, it cannot be said that to ascribe the market price as its fair value is unreasonable. The market evaluation of a stock may reflect a more realistic appraisal of its value than a conceptual evaluation. Theory must yield to the reality of the market place, "the true appraiser."[55] Indeed, to quote Judge Learned Hand again: "When all is said, value is nothing more than what people will pay for . . . ."[56]

■ The Class B stock is traded in on the over-the-counter market; the market is thin; and the traders are few. The market for the Class B stock has never approached the values urged by the objectors. The range has been be-

50. *See* Accountants' Handbook § 3, at 11 (R. Waxon ed. 1965) ; Prentice-Hall Encyclopedic Dictionary of Business Finance 78–79, 237 (1960).

51. MoPac's financial expert is of the view that were the corporation to liquidate it would probably be in such poor financial condition that no equity would be available for distribution to stockholders. Affidavit of F. L. Lee Jones, Jan. 23, 1973, at 6.

52. Borg v. International Silver Co., 11 F.2d 147, 152 (2d Cir. 1925).

53. Affidavit of F. L. Lee Jones, Jan. 23, 1973.

54. Alleghany's chief financial officer also took into account the market value of the Class A stock in appraising the value of the Class B stock and reached approximately the same valuation. Affidavit of John J. Burns, Jan. 22, 1973.

55. New York, N. H. & H. R. R., 1st Mtg. 4% B. C. v. United States, 305 F.Supp. 1049, 1069 (S.D.N.Y.1969) (Weinfeld, J., dissenting), vacated sub nom. New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970).

56. Borg v. International Silver Co., 11 F.2d 147, 152 (2d Cir. 1925).

tween $1,100 and $2,500 per share.[57] The conclusion is warranted that the public market, in pragmatic terms, has taken into account MoPac's unusual capitalized structure, whereby a so-called preference stock has voting rights that control not only MoPac's management, but also its dividend policy with the power to withhold dividends from the Class B stock, and accordingly appraised the value of the two classes of stock based upon their respective power, rights and restrictions.

Another factor suggests that the proponents' experts' valuations are closer to the mark than the objectors' valuations. Alleghany, as the majority owner of the Class B stock, has, through the years, been the principal antagonist to Mississippi, the majority owner of the Class A stock. Widely divergent views as to the B stock's value have, up to the present, foreclosed any compromise. Alleghany's acceptance of the settlement as a disposition of their longstanding controversy during which it has spent millions to protect its investment may be said to reflect a realistic recognition of the true value of the Class B shares. If the objectors' evaluation of $4,000 or more per share is sound, then Alleghany, owning in excess of 21,000 shares, has, after many years of litigation, suddenly given up the ghost and yielded more than $40,000,000 [58]—hardly a likelihood in view of the history of events and the sophistication of its financial executives and advisers.

Also, it is not without significance that objector Garfield's securities expert, who on the capitalization of earnings method fixes a value of "over $4,000" a share for the Class B stock, nonetheless concludes "that if the impasse between the Class A and the Class B is to be settled, there must be a compromise at a lower figure to reflect the lack of voting control of the Class B" [59]—another way of saying that any evaluation of the stock must make allowance for its encumbered status. Obviously that compromise figure cannot be a matter of mathematical precision; it need not be; it is a matter of judgment based upon a consideration of factors pro and con, some of which have been adverted to above. This Court is satisfied that the package of $850–16 shares common stock in exchange for each Class B share cannot be said to be inadequate, especially so when considered as a compromise.

However, the objectors argue that even so, the plan is unfair in that the compromise should be only in terms of new common stock and not include any cash payment. They contend that the $850 cash payment per share will be taxed as ordinary income, and with their individual income situations they will be subjected to high surtax rates, whereas Alleghany, by reason of its corporate structure, faces, with respect to the cash payment, a 7.2% rate. Objector Garfield contends that under the cash-stock exchange, Alleghany will benefit by over $4,000,000 in comparison with an all stock plan. Several alternative plans, including a tax free exchange (24½ shares of new common instead of the $850–16 shares for each Class B share) are proposed by objectors as being more equitable. Many of these suggestions

57. While the Class B stockholders contend that the market price of their stock has been depressed by the acts of the defendants, we deal with the fact situation as it exists. Whether the market price of the Class B shares is the consequence of defendants' alleged conduct is one of the issues *to be decided were the case to go to* trial. Similarly, objections directed to the failure of MoPac to report the earnings allocable to the B shares, as to which defendants offer an explanation, also go to the merits of plaintiffs' claim, not to the fairness or adequacy of the settlement.

58. Even assuming objector Garfield's contention as to tax consequences is correct (*see* p. 371 *infra*), an alleged tax benefit of $4,000,000 to Alleghany under the part cash payment plan would hardly justify giving up $40,000,000.

59. Affidavit of David M. Day, Jan. 30, 1973, ¶ 5.

were considered during the course of the extended negotiations. One such plan envisaged giving the minority Class B stockholders an option to receive all stock (24½ shares) in exchange for each Class B share instead of the $850–16 share package. However, based upon the opinion of independent tax counsel retained especially by the Class B representatives, other than Alleghany, this alternative was rejected since its tax consequences were potentially more unfavorable than those under the cash and stock exchange. Independent tax counsel was of the view that such an option would have exposed a substantial portion of the shares to ordinary income tax treatment.

Another approach would have eliminated the cash payment and given only stock to all Class B stockholders, including Alleghany. This proposal met with rejection because it would lower Mississippi's degree of control below its present level and further could fail to eliminate the present divided control within MoPac since Mississippi would control the preferred but not necessarily the common. To assure elimination of the divided control, as well as the friction and litigation it has engendered, Mississippi deems it essential that it have a substantial majority interest in both classes of stock. This accounts for its cash tender offer to purchase not less than 400,000 shares of new common at $40,000,000 and Alleghany's commitment to tender all its 339,888 shares of new common stock upon their receipt. Additionally, the proposal would place Alleghany in a minority position without real control over its investment and deprive it of the veto power it now has as the majority owner of the present Class B stock. Neither Mississippi nor Alleghany was amenable to this situation. Objector Garfield's suggestion that if Mississippi desires to retain its present degree of stock control that it purchase the additional shares of the new common stock to be issued to Alleghany under an all stock exchange would require Mississippi to expend, in addition to its present commitment of $40 million cash, another $20 million, an added obligation it is not prepared to assume.

▇▇▇ Whether or not the reasons for rejection of the alternative proposals were justified is not the question before this Court, which is called upon to decide whether the settlement reached by the litigants and submitted for approval is fair and reasonable. The discharge of this function does not require the Court to reopen negotiations in an effort to secure more advantageous terms, which plaintiffs, in sophisticated and arms length bargaining, were unable to secure for themselves and the class they represent. Taxes are taxes; the rates are fixed by Congress; they cannot be adjusted in particular cases to accommodate an individual taxpayer's obligation as to income derived from the settlement of a lawsuit. The tax will vary in the instance of each Class B stockholder dependent upon his particular bracket, and even corporations other than Alleghany, which may own Class B stock, will face varying tax payments. The fact is that two-thirds of the conversion package is tax free. Moreover, were the case to proceed to trial and plaintiffs secured a judgment declaring the Class B stockholders entitled to dividends in given years, the entire proceeds received by each shareholder would be taxed as ordinary income. Under all the circumstances, it cannot be said that the $850 cash payment constituting part of the conversion rate is unfair.

## OTHER OBJECTIONS

▇▇▇ Several objectors question the adequacy of the notice of the proposed settlement given to stockholders, which was mailed to each registered stockholder and published in the Wall Street Journal (National Edition). The objections go to the contents of the notice. However, it sufficiently informed any interested stockholder of the nature of

the pending action, the general terms of the settlement, that complete and detailed information was available from the files of this Court, and that any stockholder could appear and be heard at the hearing; in sum, the notice fairly apprised the members of the class of the pertinent terms of the proposed compromise and the significance of the entry of a final judgment approving the settlement.[60]

Two Class A stockholders of fifty shares object because the settlement is contingent upon Mississippi's ability to finance its tender offer obligation, and therefore, "if such financing is not available, the parties will have gone to considerable expense . . . to no good purpose." However, Mississippi already has secured a formal commitment of financing which has been found satisfactory by Alleghany and its counsel.[61] The same objectors also express concern over the possible effects of the cash payout upon MoPac's financial structure. MoPac has represented that this presents no problem to a railroad of its size.[62]

A MoPac debenture holder has raised a question as to possible impairment of the rights of debenture holders. Under the terms of the settlement, an opinion of MoPac's counsel is required to the effect that none of the transactions are in breach or in default of any of the provisions of any indenture or other instrument binding upon MoPac. It is represented to the Court that MoPac's counsel upon a review of all documents is prepared to render such an opinion.

Objections are made to fees requested by attorneys representing the respective plaintiffs. To the extent that such allowance may be granted, the parties are to be paid equally by Mississippi and MoPac. However, the fee applications are, in the event of acceptance of the settlement, subject to approval by the Court and a separate hearing, notice of which will be given to all interested parties, at which time any objections may be presented to the Court.

## CONCLUSION

This Court, after thorough consideration of all pertinent factors and of the extensive contentions of the objectors and proponents with respect thereto, and weighing the benefits to be derived from the settlement against the alternative of a continuance of this litigation, with its outcome doubtful, and, even if successful, the uncertainty of any meaningful recovery, concludes that the settlement falls within a "range of reasonableness"[63] that warrants its approval. In sum, it offers a permanent solution to the longstanding impasse between the two contending groups of stockholders—a result that cannot be achieved through successful litigation. Indeed, continued litigation may be said to be an exercise in futility since the hard core of the cause of differences between the two groups would remain and continue to plague them and MoPac. The settlement will afford MoPac the opportunity to pursue merger prospects so vital to its economic growth and existence and to permit its officials to give full time and attention to corporate affairs. Also

---

60. Air Lines Stewards Local 550 v. American Airlines, Inc., 455 F.2d 101, 108 (7th Cir. 1972); *see* United Founders Life Ins. Co. v. Consumers Nat'l Life Ins. Co., 447 F.2d 647, 654 (7th Cir. 1971); *see also* Winkelman v. General Motors Corp., 48 F.Supp. 490, 494 (S.D.N.Y. 1942).

61. Defendants' Supplemental Reply Memorandum at 5–6; Hearing Minutes at 41–42.

62. *See* Jones Affidavit at 5; Affidavit of Downing B. Jenks, Jan. 22, 1973, at 10.

63. *See* Newman v. Stein, 464 F.2d 689, 693 (2d Cir.), cert. denied, Benson v. Newman, 409 U.S. 1039, 93 S.Ct. 521, 34 L. Ed.2d 488 (1972); *see also* United Founders Life Ins. Co. v. Consumers Nat'l Life Ins. Co., 447 F.2d 647, 655–56 (7th Cir. 1971).

it means the prospect of greater annual dividends to the Class B stockholders; a broader market for their shares; and the opportunity for representation on the Board of Directors. Even were it to be found that the Class B stock approached the approximate $4,000 value per share as estimated by a number of objectors, the settlement still would come within a range of reasonableness and warrant approval. Finally, if a majority of the minority Class B stockholders are of the view that the advantages of the settlement are insufficient to compensate for what they believe to be the value of their shares, they have the power to reject it.

The settlement is approved and judgment may be entered accordingly.